Harry Y. Victor et al., Appellants, v. Herbert Hillebrecht et al., Appellees.

Gen. No. 43,867.

■■■■■■■■ Opinion filed March 1, 1949. Released for publication January 23, 1950. (Published in full by order of the court. Formerly in abstract form 337 Illinois Appellate 383.)

SHULMAN, SHULMAN & ABRAMS, of Chicago, for appellants; MEYER ABRAMS, of Chicago, of counsel.

WINSTON, STRAWN & SHAW, of Chicago, for appellees; JAMES H. CARTWRIGHT, of Chicago, of counsel.

MR. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court.

Pursuant to a reorganization plan approved in a proceeding instituted under section 77B of the Bankruptcy Act (11 USCA § 207), a liquidation trust agreement was executed on November 6, 1935, as to the property located at 7000 South Shore Drive, Chicago, Illinois, which premises are improved with a 16-story apartment hotel building, containing 31 unfurnished apartments and 148 furnished apartments. Under said agreement the Trust Company of Chicago was named liquidation trustee and Herbert Hillebrecht, Walter A. Wade and James V. Bremner were named as trust managers.

This suit was instituted as a representative proceeding by several owners of beneficial units of the trust to compel the trust managers and the liquidation trustee to submit an offer of purchase of the trust property to the beneficiaries, to liquidate the trust estate and to distribute its assets. The complaint also asked that certain beneficial units purchased by Hillebrecht, one of the trust managers, after he had assumed his trust duties, be decreed to be trust property upon his reimbursement for his outlays in purchasing such beneficial units.

The cause was submitted on the complaint and answer and after evidence and argument were heard

256

by the chancellor he entered a decree dismissing the complaint for want of equity. Plaintiffs appeal. There is no question raised on the pleadings.

The trust was to continue for a term of 15 years, expiring July 1, 1950, but was subject to prior termination by the liquidation of the trust property. The purpose of the trust as stated in section 2 of article II of the trust agreement was "to liquidate the Trust Property" and convert same into cash and to that "end" and "purpose" the liquidation trustee and the trust managers were directed to "endeavor to make sale or other disposition of the Trust Property as soon as in the opinion of Trust Managers it can be done advantageously and to distribute the proceeds of such sale and disposition to and among the holders of Participation Certificates."

Section 2 of article XIV of the trust agreement provides as follows:

"It is the intent hereof that Trust Managers shall by written directions to Liquidation Trustee liquidate Trust Property and in the interim supervise the management, operation, improvement, protection and maintenance thereof, all as Trust Managers in their judgment may deem advantageous to the holders of Participation Certificates issued hereunder."

In section 3 of article III of said agreement it is provided that no sale of the trust property may be made unless the liquidation trustee "shall first give notice to the holders of Participation Certificates then outstanding, briefly describing the property and the terms and conditions of the proposed sale," and that, "if within 20 days after the giving of such notice holders of Participation Certificates representing 33-1/3 per cent or more of the then outstanding Trust Units shall file with Liquidation Trustee written dissents from such proposed sale," the "Liquidation Trustee shall not consummate such proposed sale."

At the time the trust was created, one trust unit was given to bondholders in exchange for each $100 of the principal amount of bonds they owned. While acting as trust managers Hillebrecht and Wade purchased beneficial interests in the trust through the agency of Greenebaum Investment Co., a brokerage house, which maintained an active market for such interests. In addition to 35 trust units received by Hillebrecht in exchange for $3,500 in bonds which he owned when the trust was created, he purchased from time to time, commencing during the summer of 1936, various blocks of units at prices ranging from $19 to $51.50 per unit, so that at the time of the trial he owned 1,480 units or more than one-tenth of the 14,439 outstanding trust units. He purchased for his brother, his sister and his mother an aggregate of 138 units. Wade purchased 50 trust units, for which he paid $51.50 per unit, and he purchased additional trust units for members of his family.

In 1943, the trust managers received offers of $450,000 and $550,000 for the trust property and in January 1946, they received an offer of $750,000. All of these offers were regarded by the trust managers as insufficient and they were not submitted to the beneficiaries for their consideration. On February 11, 1946, which was more than ten years after the trust had been created, the trust managers received an offer of $850,000 for the trust property, which they also refused. However, having had an appraisal made which showed the value of the property to be $850,000 the trust managers wrote a letter to the liquidation trustee on February 15, 1946, which contained the following paragraph:

"The Trust Managers have concluded that they will advise the owners and holders of certificates of beneficial interest of Mr. Meier's offer [$850,000] and certain other facts which they consider relevant. They

258

will not recommend to the owners and holders of certificates of beneficial interest the acceptance of the Meier proposal.''

Plaintiffs' complaint alleged *inter alia* that the trust managers intended to mail a communication to the owners of the beneficial interests recommending that the $850,000 offer be rejected and that they had no authority to make any such recommendation. By way of relief in this regard the complaint asked that the trust managers be restrained from mailing any communication to the beneficiaries in connection with the submittal of said offer without the approval of the court and that ''the court may approve the form of the communication and direct the defendants to mail such communication to the unit holders pertaining to the sale of the premises.''

The trust managers in their answer admitted in effect that they intended to mail a communication to the certificate holders recommending the disapproval of the $850,000 offer.

When cross-examined by plaintiffs' counsel under section 60 of the Civil Practice Act [Ill. Rev. Stat. 1949, ch. 110, par. 184; Jones Ill. Stats. Ann. 104.060], Hillebrecht was asked the following question and he made the following answer:

''Q. Now, then the offer of $850,000 was made to the trustees, the trustees instructed the Trust Company of Chicago to submit an offer but the trustees stated that they would recommend that the trust certificate holders shall dissent from the sale; is that correct?

''A. That is right; that is the way it was left.''

Later in his testimony, upon interrogation by the trial judge and defendants' attorney, he stated that the trust managers had decided, before they sent their letter of February 15, 1946 to the liquidation trustee, to submit the offer of $850,000 to the certificate holders without any recommendation.

259

The complaint charged that only one of the trust managers, Hillebrecht, acquired beneficial interests in the trust and that he had purchased one-third of the outstanding interests. When the proof showed that Hillebrecht acquired approximately one-tenth of the beneficial interests after he became trust manager, that members of his family acquired additional trust units and that Wade had also acquired beneficial interests after he became trust manager, plaintiffs presented to the trial court an amendment to the complaint, which they claimed conformed the complaint to the proof. The court denied leave to file the tendered amendment but defendants' counsel agreed that ''no point would be urged upon appeal that the allegations of the complaint did not conform to the proof.''

Plaintiffs contend (1) that ''the Trust Managers and the Liquidation Trustee were in duty bound to submit the offer to the beneficiaries without any attempt on their part to influence the beneficiaries whether or not to dissent and the Chancellor clearly erred when he denied such relief;'' (2) that ''the Trust Managers having consented to submit the offer without any recommendation, it was the duty of the court to grant the relief''; and (3) that ''trustees must be impartial and have no right to take sides by creating a clash among the beneficiaries of the trust.''

Defendants assert in effect that, because Hillebrecht changed his testimony and stated that the trust managers had decided, before they sent the letter to the liquidation trustee, to submit the offer without any recommendation, the chancellor properly refused to interfere with the trust managers, even to the extent of directing them to secure the court's approval of the communication they proposed to send to the beneficiaries with the submission of the offer.

As we understand defendants' position in this regard, it seems to be that, when Hillebrecht's testimony

260

that the trust managers had decided before they sent their letter of February 15, 1946 to the liquidation trustee to submit the $850,000 offer to the beneficiaries without any recommendation is considered in connection with the statements contained in said letter, it can only be reasonably concluded that the trust managers never intended to do otherwise than to submit the offer without any recommendation. The position of the trust managers in this respect is a complete departure from their position not only from the inception of this litigation but from the time they wrote the letter, heretofore set forth, to the liquidation trustee, two weeks before this suit was commenced. Plaintiffs construed this letter as an indication by the trust managers of their intention to recommend to the beneficiaries "not to sell" and the complaint alleged that such was the intention of the trust managers. That plaintiffs were warranted in so interpreting the letter is demonstrated by the fact that the trust managers placed the same interpretation upon it in their sworn answer. Furthermore, defendants' counsel in his opening statement at the trial asserted that "the trust managers did intend to finally submit that offer to the certificate holders but would recommend to them that it be not accepted" and Hillebrecht testified shortly after said opening statement was made that when the direction was given to the liquidation trustee to submit the offer of $850,000 to the holders of certificates of beneficial interests, the trust managers stated that they would recommend that the beneficiaries "shall dissent from the sale." In view of Hillebrecht's original testimony, the position of the trust managers both prior and subsequent to the time they sent the foregoing letter to the liquidation trustee as to their right to recommend the rejection of the offer and the theory of defendants' counsel at the time of the trial to the same effect, it is readily apparent that, when Hillebrecht testified that the trust managers had

261

decided, even before they sent the letter to the liquidation trustee, to submit the offer without any recommendation, such testimony was unworthy of belief and should have been entirely disregarded. This belated testimony of Hillebrecht was directly contrary to his prior positive testimony that the trust managers intended to recommend to the beneficiaries the rejection of the offer. He couldn't possibly have been confused or honestly mistaken when he changed his testimony and the record discloses that even his own attorney was surprised at such change. The only possible explanation for the sudden switch in Hillebrecht's testimony is that he finally realized that the trust managers had assumed an untenable position by claiming that they had the right to recommend the rejection of the offer and he thereby sought to extricate them from such position.

██ It has been repeatedly held that under a trust agreement creating a liquidation trust, such as that involved herein, the trust managers must include in the notice to the beneficiaries of an offer to purchase the trust property an impartial statement of the relevant facts pertaining to the property and its condition and the terms and conditions of the offer, that such notice must not include mere conclusions of the trust managers as to the advisability or inadvisability of accepting the offer, that the offer must be submitted without any attempt on the part of the trust managers to influence the beneficiaries for or against its acceptance, except as they might be influenced by the relevant facts, and that it is for the beneficiaries to draw their own conclusions from such facts as to whether the offer should be approved or disapproved. (*Shapiro v. Chicago Title & Trust Co.*, 328 Ill. App. 650; *Gaver v. Gaver*, 176 Md. 171, 4 A. (2d) 132, 138; *Adams v. Cowen*, 177 U. S. 471, 483.) To hold otherwise would defeat the very purpose and intent of the trust agree-

262

■■■■■■■■■■■■■■■

■■■■■■■■■■

ment to allow the beneficiaries to make their own decision on the acceptance or rejection of an offer, uninfluenced by the desires of the trust managers.

That the trust managers still do not intend to restrict their communication to the beneficiaries to a statement of the relevant facts in connection with the property and the offer, unless they are compelled to do so, is clearly demonstrated by the suggestion in defendants' brief that the trust managers "would probably advise the beneficiaries" that "possibly a much greater price would be in prospect" if and when the OPA rent regulations "ended." At the time the offer was made and at the time this case was tried, it was a matter of pure speculation as to when the rent regulations would be abrogated and, if they were, there were many other unpredictable factors which might well affect the price procurable for the property, notwithstanding the removal of the ceiling on rents.

The principal purpose of this suit was to restrain the trust managers from wrongfully attempting to influence the certificate holders to vote to reject the $850,000 offer and to compel them to submit the offer without any recommendation. The trust managers were strongly opposed to the acceptance of the offer. The only reason they condescended to submit it at all to the beneficiaries was because they knew that they would have been derelict in their duty as trustees, if they failed to submit it, after having procured an appraisal themselves from the Chicago Real Estate Board showing that the value of the property was $850,000.

■■■ Plaintiffs, having been compelled to seek the aid of a court of equity to frustrate the wrongful intention of the trust managers to recommend the rejection of the offer, certainly should not have been denied the relief sought in this regard, after they had established their right to it.

Closely related to the opposition of the trust managers to the $850,000 offer is the ownership by Hillebrecht and Wade and members of their families of more than one-tenth of the outstanding beneficial units of the trust.

Plaintiffs insist that the trust managers violated their duty as trustees by purchasing beneficial interests in the trust, because by so doing they placed themselves in a competing position as to the beneficiaries generally and one that might well be adverse to them.

Defendants' position in this regard is (1) that "the trust managers had a right to purchase units of beneficial interest for themselves;" (2) that "if there was impropriety in any purchase of a certificate, the seller is the only one who can complain" and (3) that "the ownership of units of beneficial interest creates no interest in the trust managers adverse to the interests of the beneficiaries generally."

Since no case in this or any other jurisdiction has been called to our attention by counsel for either side, wherein the precise questions presented here have been determined, such questions must be considered in the light of fundamental rules of equity applicable generally to the conduct of trustees.

██ Article XIV of the trust agreement provides that "trust managers may, but need not, be holders of" participation certificates. The obvious purpose of this provision was to enable the holders of bonds, who were to receive certificates, to qualify as trust managers but the trust instrument did not authorize the trust managers, after they became such, to acquire beneficial interests in the trust.

██ Counsel for defendants assert that, while it is true that the trust agreement does not expressly authorize the purchase by the trust managers of beneficial units in the trust, it is also true that said agreement does not expressly prohibit their purchase of

such units. They further assert that while the trust managers may be considered as trustees for the unit holders as far as the hotel property and its management and operation are concerned, they can in no sense be considered as trustees of the beneficial units or the certificates representing them, since they have absolutely no control over those units or certificates and stand in no fiduciary relationship in respect thereto. It is then urged that the trust units are more closely akin to shares of stock in a corporation than to the interest of a beneficiary under an ordinary trust created by will or *inter vivos* agreement and that the rules applicable to purchases by trustees from beneficiaries do not apply. In support of their position in this respect, defendants cite *Hooker v. Midland Steel Co.,* 215 Ill. 444, *Bawden v. Taylor,* 254 Ill. 464, and *Anchor Realty & Investment Co. v. Rafferty,* 308 Ill. App. 484. These cases involve the right of directors to purchase the stock of their corporations and hold in effect that, since the business and property of a corporation are entrusted to its officers and they are empowered to act for the whole body of stockholders, they therefore occupy the position of trustees for the stockholders as a body in respect to such business and property and cannot have or acquire any personal or pecuniary interest in conflict with their duty as such trustees; that there is no trust relationship between a director of a corporation and an individual stockholder with respect to the latter's stock, over which the director has no control whatever; and that, therefore, he may deal with an individual stockholder and purchase his stock practically on the same terms as a stranger. It is the lack of a trust relationship between them that permits directors to purchase the stock of a corporation from its shareholders. The rule enunciated in the foregoing cases is not applicable to an express trust, where the relation of trustee and *cestui qui* trust exists. The

265

trust instrument in the case at bar expressly provides that "the agreement creates a true trust" (section 3, article II) and another provision of the instrument (section 2, article XIV) charges the trust managers with the specific duty of liquidating the trust property for the benefit of the certificate holders, thereby making them trustees for the individual beneficiaries.

On oral argument defendants cited *Donnelly v. Consolidated Investment Trust,* 99 F. (2d) 185, as an additional authority on the right of the trust managers to purchase trust units from the beneficiaries of the trust, as distinguished from the purchase of the trust property itself. In our opinion, the *Donnelly* case is not applicable, because it involved a so-called Massachusetts Trust, which was characterized by the court as "a common form of business organization," likened "for the purposes of taxation . . . to corporations, which they much resemble, the trustees being analogous to directors and the shareholders to corporate stockholders."

The distinction between a Massachusetts trust and a liquidation trust appears from the decision in *Morrissey v. Commissioner of Internal Revenue,* 296 U. S. 344, where the court, holding that such an organization has the characteristics of a corporation and is therefore distinguished from the ordinary trust, said: "In what are called 'business trusts' the object is not to hold and conserve particular property, with incidental powers, as in the traditional type of trusts, but to provide a medium for the conduct of a business and sharing its gains. Thus a trust may be created as a convenient method by which persons become associated for dealings in real estate, the development of tracts of land, the construction of improvements, and the purchase, management and sale of properties; or for dealings in securities or other personal property; or for the production, or manufacture, and sale of

commodities; or for commerce, or other sorts of business; where those who become beneficially interested, either by joining in the plan at the outset, or by later participation according to the terms of the arrangement, seek to share the advantages of a union of their interests in the common enterprise.'' That form of organization bears no resemblance whatever to the liquidation trust here under consideration, the object of which was to dispose of the property ''as soon as in the opinion of the trust managers it can be done advantageously'' and to distribute the assets among the beneficiaries.

 Defendants insist that if there was impropriety in any purchase of a certificate, the seller is the only one who can complain. They readily admit that a trustee cannot purchase in his own name and for his own benefit an outstanding judgment lien, squatter's right in the trust property, etc., and that, if he does so, the trust is entitled to the benefit thereof upon reimbursing the trustee for his outlays in connection with such a purchase, but they say that this rule has never been applied to the purchase by a trustee of a beneficial interest from a beneficiary. By specious reasoning defendants argue that since the trustee has the right to purchase for himself the interest of a beneficiary and that such a purchase can be set aside only for fraud, ''it seems to us axiomatic that the only one who can complain of the fraud is the person defrauded.'' There is no force to this argument in view of the obvious fact that the rights of the holders of trust units who did not sell same to Hillebrecht and Wade, were also affected by the conduct of the trust managers, as will be hereinafter shown. The cases cited by defendants, which hold that conveyances in fraud of creditors can be set aside only by creditors who are defrauded, are not applicable. The question as to whether the trust managers were guilty of fraud

as to the holders of trust units, who sold them to Hillebrecht and Wade, is of no consequence in this proceeding. The question here concerns rather the propriety of the purchase by the trust managers of beneficial interests in a trust, which was created for the benefit and advantage of the beneficiaries generally, in whom was vested the right to accept or reject an offer to purchase the trust property upon its submission to them by the trust managers.

 This brings us to the consideration of defendants' contention that "the ownership of units of beneficial interest creates no interest in the trust managers adverse to the interests of the beneficiaries generally."

That the trust managers were unwilling to sell the property at any reasonable price at the time they received the $850,000 offer appears from the allegation in the complaint, which was not denied, that said offer was made without any privilege to the offeror, who was willing, in the event that offer was approved by the certificate holders, that higher bids might be received and the property sold to the highest bidder for cash. Although he read the form of the offer, Hillebrecht testified that he did "not know that in the offer of $850,000 we [the trust managers] had the right to receive higher bids," and then added that "if there was a price of $850,000 submitted without any condition, just to find out how the bondholders felt, the trust managers would not even want to submit it at any price at this time, even though we would not be bound on their approval to sell." This testimony indicates the determined opposition of the trust managers not only to the $850,000 offer but to any higher offer that might have been made at that time and it affords a reasonable explanation for such opposition and for the willingness of Hillebrecht and Wade to invest upwards of $40,000 of their own funds in ac-

268

quiring large blocks of trust certificates. If permitted to continue their acquisition of trust units, they could purchase enough certificates themselves or in combination with others to attain sufficient voting strength to block any bid made and thus defeat the wishes of the holders of as many as two-thirds of the trust units who might desire to sell the property, until such time as the trust managers considered it advantageous to themselves to liquidate the trust.

It would be naive, indeed, to ascribe to Hillebrecht and his cotrustee the altruism they claim in purchasing these certificates—to prevent others from acquiring control. Their conduct can be interpreted only as a course of speculation in securities of the trust for their own advantage and, when they embarked on such a course, they did so to create for themselves an interest in the trust, which was patently adverse to the interests of the beneficiaries generally, many of whom undoubtedly desired that the trust property be sold at a fair price and at a relatively early date. Furthermore, by voting his trust units against the $850,000 offer, as he testified he would, Hillebrecht would necessarily compete with the beneficiaries who favored the acceptance of such offer.

The fact that the trust managers had not acquired the one-third interest in the trust necessary to block any offer that might be submitted for the purchase of the trust property is not of crucial importance, because their ownership of more than one-tenth of the trust units could easily lead to the formation of a group strong enough to reject any offer made, however advantageous it might be considered by the remaining certificate holders.

Even though it be assumed that the trust managers did not stand in a fiduciary relationship in respect to the trust units when they purchased them, their ownership of same gave them a substantial interest in the

trust, which might readily tempt them to neglect the interests of the beneficiaries generally.

In this state the fundamental duty of a trustee is defined in *Thorp v. McCullum,* 6 Ill. 614, one of the earliest decisions of our Supreme Court, from which we quoted as follows in *People ex rel. v. Central Republic Trust Co.,* 300 Ill. App. 297: "The temptation of self-interest is too powerful and insinuating to be trusted. Man cannot serve two masters; he will forsake the one and cleave to the other. Between two conflicting interests, it is easy to foresee, and all experience has shown, whose interests will be neglected and sacrificed. The temptation to neglect the interest of those thus confided must be removed by taking away the right to hold, however fair the purchase, or full the consideration paid; for it would be impossible, in many cases, to ferret out the secret knowledge of facts and advantages of the purchaser, known to the trustee or others acting in the like character. The best and only safe antidote is in the extraction of the sting; by denying the right to hold, the temptation and power to do wrong is destroyed."

That Illinois courts have steadfastly adhered to the principle enunciated in the *Thorp* case is shown in *Bennett v. Weber,* 323 Ill. 283, wherein the court said that "early in the history of the State, it was laid down as a general principle of equity that a trustee cannot deal on his own account with the thing or the person falling within the trust; . . . a trustee is not permitted to place himself in a position where it will be difficult for him to be honest and faithful to his trust." In the early case of *Michoud v. Girod,* 4 How. 503, 11 L. Ed. 1076, the court said: "There is no blinking the fact that the ground on which the court denounces as a fraud the purchase by a trustee of trust property is that it inevitably brings about a conflict of interest between himself personally and the bene-

270

ficiaries of his trust; or at least incites a motive, or affords opportunity for a motive, on the part of the trustee to take advantage of his superior knowledge acquired in his trust capacity, which may induce him to conceal his information from the beneficiaries or not to employ it exclusively for their benefit while they are relying on him scrupulously to devote himself to the furtherance of their welfare.''

In *Wootten v. Wootten,* 151 F. (2d) 147, the court said (p. 150): ''A trustee must not compete with his beneficiary in the acquisition of property. The principle is not limited to cases where the fiduciary acquires property entrusted to him, nor to cases where the fiduciary competes with the beneficiary in the purchase of property which the trustee has undertaken to purchase for the beneficiary. *Even though the interest purchased by the fiduciary for himself is not property of the beneficiary entrusted to the fiduciary, nor property which the fiduciary has undertaken to purchase for the beneficiary, the principle applies if the property purchased by the fiduciary for himself is so connected with the trust property or the scope of his duties as fiduciary, that it is improper for him to purchase it for himself.''* (Italics ours.)

 The following often-quoted excerpt from the opinion in *Meinhard v. Salmon,* 249 N. Y. 458, 164 N. E. 545, written by Mr. Justice CARDOZO, may well be used as a standard for the scrupulous conduct required of a trustee: ''Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the *punctilio* of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when

271

petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. (*Wendt v. Fischer,* 243 N. Y. 439, 444.) Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court.''

In *York v. Guaranty Trust Co. of New York,* 143 F. (2d) 503, the court emphasized the fact that a trustee owes his beneficiaries undivided loyalty, ''entirely untinged by considerations of any important benefits to himself . . . and one whose edge cannot be dulled by frequent use,'' and quoted with approval an excerpt from *Bayer v. Beran,* N. Y. L. J. April 20, 1944, wherein Mr. Justice Shientag said: ''While there is a high moral purpose implicit in this transcendent fiduciary principle of undivided loyalty, it has back of it a profound understanding of human nature and of its frailties. It actually accomplishes a practical beneficient purpose. It tends to prevent a clouded conception of fidelity that blurs the vision. It preserves the free exercise of judgment uncontaminated by the dross of divided allegiance of self-interest. It prevents the operation of an influence that may be indirect but that is all the more potent for that reason.''

Professor Bogert in his work on Trusts and Trustees, volume 3, section 484, summarizes the rule as follows: ''One of the cardinal principles in the law of fiduciary relationships is the rule that the fiduciary must be absolutely loyal to his beneficiary or principal and that he must exclude all selfish interest in his dealings. . . .'' The principles enunciated in these and other authorities that might be cited, have been generally followed and the courts invariably emphasize that it is only by rigid adherence to them that all temptation can be removed from a fiduciary to serve his own interest when it is in conflict with the obligations of his trust.

Considering the conduct of the trust managers in the light of the foregoing principles of equity, we are impelled to hold that their course of dealing was utterly inconsistent with their duties as trustees. Accordingly, they should be relieved of their positions as trust managers and others appointed in their stead, in whom the beneficiaries may have the utmost confidence; and in view of our conclusion that the trust units purchased by the trust managers constituted adverse and competing interests, so far as the sale of the trust property is concerned, Hillebrecht and Wade should be required to hold the certificates representing such trust units subject to the trust, if the *cestuis qui trustents* so demand and tender the price which said trust managers paid for such certificates. (*Rankin v. Barcroft & Co.*, 114 Ill. 441; Bogert on Trusts and Trustees, vol. 3, sec. 485; *Wootten v. Wootten*, 151 F. (2d) 147.)

For the reasons stated herein the decree of the superior court of Cook county is reversed and the cause remanded with directions that a decree be entered in accordance with the views herein expressed.

*Reversed and remanded with directions.*

FRIEND and SCANLAN, JJ., concur.