Claude U. Stone, Trustee and Executor Under Will of Fannie G. Baldwin, Deceased, Plaintiff-Appellee, v. Sidney Baldwin et al., Defendants.
Helen Baldwin Smith, Margaret Baldwin Holley et al., Petitioners-Objectors-Appellants, v. George Z. Barnes, Peoria Newspapers, Inc., and Peoria Star Company, and Claude Stone, Defendants.

### Gen. No. 10,576.

Opinion filed May 20, 1952. Rehearing denied June 6, 1952. Second petition for rehearing filed June 14, 1952 and denied December 10, 1952. Released for publication December 10, 1952.

CASSIDY & SLOAN, of Peoria, for appellants.

REN THURMAN, and BLACK, BLACK & BORDEN, all of Peoria, for appellee.

MR. JUSTICE ANDERSON delivered the opinion of the court.

Claude U. Stone, appellee, executor and trustee under the will of Fannie G. Baldwin, deceased, filed his resignation and first and final report as trustee in the circuit court of Peoria county where the trust was pending. Helen Baldwin Smith and Margaret Baldwin Holley, appellants, made objections to the reports. After a lengthy hearing (the abstract of the record of the proceedings consisted of 441 pages), on July 31, 1951, the chancellor overruled all objections to the report. The court decreed that the fair value of Stone's services as a trustee from January 1, 1939 to January

1, 1944 should be $10,000 a year, but that he should be surcharged for the amount of compensation that he received as executor, for the money he received as president of the Star, and for the amount indicated in his report that he had advanced to himself as part payment on his fees, leaving a balance due him for fees of $10,923.75. Appellants have appealed from this decree.

The trust involved was created by the last will and testament of Fannie G. Baldwin. She died in 1938 at the age of 95. Shortly thereafter her will was admitted to probate in the probate court of Peoria county and Claude U. Stone, designated in her will as executor and trustee, was appointed executor in December 1938, and continued to act as executor until his discharge by the probate court in January 1946. His first and final account as executor was approved by the probate court who fixed his fee at $7,126.25. The probate court order directed that all assets in his hands be turned over to himself as trustee. At the time of his discharge the estate was $77,000 in debt and the probate court had entered an order authorizing the executor to pledge the Peoria Star stock with the bank to secure the above mentioned debt. The major part of the decedent's estate consisted of 798 shares of stock in the Peoria Star Company. The total shares in this company were 940. The value of this stock at the death of the decedent was approximately $600,000.

The Peoria Star for many years had published an afternoon newspaper in the City of Peoria. Fannie G. Baldwin had been active in publishing this paper and was for many years president of the corporation. For some years prior to her death, Claude U. Stone was her attorney and had charge, in a large measure, of her financial affairs. He was vice-president of the Star and as such officer had large control over its policies and of its business affairs.

The will and codicil of Fannie G. Baldwin devised in trust practically all her property to Claude U. Stone as trustee and gave him broad powers as follows: It provided that he should manage and control the trust estate so as to produce the greatest amount of net income consistent with the reasonable security and safety of the trust estate; it gave him power to vote all shares of corporate stock and to convey or mortgage the property of the trust for the best interests of the estate; it provided that he might nominate his successor in trust. The will further provided:

"My object and purpose in continuing this trust for the period indicated is for the reason I most ardently desire the newspaper known as the Peoria Star, which constitutes the greater part of the property that will come to this trust estate, to be and remain strictly a Peoria institution, controlled at all times by Peorians for as long a period as it is possible for me to fix under the Will, provided, however, it is not my intention or purpose by the foregoing statement to limit the power of my said trustees to sell my stock in the Peoria Star Company at any time or to whomsoever they deem proper if my trustees in their judgment think it advisable and beneficial to said trust estate to do so."

The creator of the trust further provided that the trust was to continue for twenty years after the death of the last surviving granddaughter: that sixty per cent of the net income was to go to Sidney Baldwin, her unmarried daughter; and forty per cent to go equally to her granddaughters, Helen Smith and Margaret Holley. At the termination of the twenty-year period, the corpus of the trust was to go to the granddaughters if living, otherwise to their descendants. The will further provided that the trustee was to give bond to be approved by the circuit court and to file annual reports with the court.

230

From the death of the testatrix until 1945 the estate was involved in a great deal of litigation. Stone, the executor and trustee, successfully defended this litigation, which cost the estate large sums of money, largely for attorneys' fees. Some of the litigation went to the Appellate and Supreme Courts. George Z. Barnes, now deceased, was attorney for Stone through all this litigation. This litigation was finally terminated and various settlements concerning the same are incorporated in the decree of the circuit court entered in September 1945, as hereafter mentioned.

After the death of Mrs. Baldwin, at the annual stockholders' meeting of the Peoria Star, Stone voted the stock of the Star to elect himself and Barnes as Directors. The Directors later elected Stone president and publisher and Barnes vice-president. This was in 1939. That year Stone received no salary as president of the Star, but from 1940 to 1943, the Board of Directors voted him a salary of $5,000 per year. The aggregate salary received by him from 1940 to 1943 was $20,500. He continued as president of the Star until 1950, but claimed no salary for the period from 1944 to 1950.

The fees claimed by Stone as trustee cover a period from January 1, 1939, to January 1, 1944. Stone was trustee until June 17, 1949, but makes no claim for trustee's fees from 1944 to 1949. During this latter period he was receiving a large salary and commissions as Chairman of the Board of Directors of Peoria Newspapers, Inc. From 1939 to 1943 the Baldwin estate and the Peoria Star went through a period of great financial distress. This was partly owing to the facts that the newspaper was losing money and that the estate had paid out or was obligated to pay large sums of money in defense of the litigation above mentioned. The Board of the Star held various meetings

231

with their creditors and discussed whether or not the Star should be sold to pay its debts. It appears from the evidence through this period that Stone was doing everything in his power to carry on the newspaper for the benefit of the trust.

In 1943 the Peoria Journal was likewise being published in Peoria. A plan was devised between the Boards of Directors of the two newspapers to merge. Much thought, investigation, and many conferences were held over this plan in all of which Stone, the trustee, took a principal part, and the merger was accomplished. Stone, as president of the Peoria Star, agreed to the merger, and it was subsequently unanimously approved by the Directors of the Star and its stockholders. The merger agreement provided that the Peoria Star Corporation and the Journal Corporation were to remain as corporate entities. The Peoria Star was to operate a morning paper and the Journal an evening paper, and the policies of the papers were still to be controlled by the Star and Journal companies. The assets were to be pooled, and the Peoria Newspapers, Inc. was to receive the profits and disburse them to the stockholders of the two other corporations, one-third to the Star and two-thirds to the Journal. The by-laws of Peoria Newspapers, Inc. provided: that the initial Board of Directors should consist of five persons, three to be elected by the stock held by the Journal and two by the Star stock; that the Board of Directors should consist of a president, two vice-presidents, and a chairman, among others; that the Journal Board of Directors should have exclusive power to elect the president, the vice-presidents, the secretary, and to fill vacancies in those offices; that the Peoria Star Directors should have exclusive power to elect the chairman of the board, the vice-chairman, the treasurer, the assistant treasurer, and to fill vacancies of said offices. Under these by-

232

laws, by virtue of his voting the stock of the Star, Claude U. Stone was elected chairman of the Board and continued to act in that capacity from the date of the merger to April 15, 1950. From about July 17, 1949 to April 15, 1950, Stone acted as chairman of the Board and drew compensation therefor. During this time he was no longer acting as trustee. George Z. Barnes was vice-president of the Peoria Star and later a paid officer of the merged corporation. Under the merger agreement (which was approved by the circuit court on petition of the trustee), the chairman of the Board was to receive a salary of $12,500 per year and three and one-third per cent of the amount accumulated for distribution as provided by the merger agreement. Stone, as chairman of the Board, from 1944 to 1950, received as salary and bonus payments $194,107.15. During that period the trust received from the operation of the newspaper $273,055.97. It is apparent that after the merger the Star came into a period of unprecedented prosperity, which has continued to this date.

The circuit court had approved the merger plan and directed the trustee to proceed to carry out the order as entered December 31, 1943. In September 1945, Stone, the trustee, asked the circuit court to take jurisdiction of the trust, and for other relief. Proper notice having been given to all parties interested, the court took jurisdiction of the trust, and in its decree dated September 19, 1945, the trustee was authorized to borrow money and pledge the stock. The settlement of the litigation above mentioned was approved. Attorneys for the appellants appeared at this hearing and approved the decree.

In April 1946, Stone closed his account as executor and entered a new account in the same bank as trustee. Stone as trustee never gave bond at any time, nor did he file annual reports, both being required under the

233

will. The beneficiaries under the trust had at no time theretofore questioned the right of Stone to act as trustee nor had they ever asked the court to require him to give bond or file annual reports.

In March 1949, Stone became ill, resigned as trustee, and filed his first and final report, the one here in question. The report shows receipts and disbursements from the creation of the trust to July 17, 1949. We cannot recite all the items of this report as it would unduly lengthen this opinion.

█ Claude U. Stone was still ill at the time of the hearing on the report, and on the testimony of two doctors, who stated that his appearance at the hearing would endanger his health, the chancellor did not require him to appear and testify. His deposition was not taken. George Barnes and E. V. Champion, attorneys for Stone, and Clarence J. Zehr, assistant secretary-treasurer of the Peoria Star, all testified fully as to what Stone had done from the commencement of the trust until his resignation. The auditors also testified. There was very little dispute as to any of this testimony nor as to what the trustee had done as trustee and as executor. It is unfortunate that Stone could not testify. The chancellor did not abuse his discretion in that regard—not requiring him to appear and testify.

Appellants' position is disclosed by their objections to the report. They urge: (1) That the fact that the trustee did not file a bond or make annual reports prevented him from recovering any fees; that these provisions are conditions precedent, and his failure to comply with them forfeits his compensation; (2) that the evidence in the record concerning the report discloses that during the pendency of the trust, Stone had advanced himself illegally for fees as trustee the sum of $11,450, and by so doing he forfeits all compensation; (3) that the report of the trustee as disclosed by

234

his improperly kept books and accounts is so incomplete, erroneous, indefinite, and uncertain that it precludes recovery for fees; (4) that the trustee should not be permitted to receive any fee as trustee while he was acting as executor; (5) that the record discloses that the trustee, from the date of the probate of the will to the date of his resignation, was engaged in self-dealing for his own profit; that he was not performing his duties as a trustee with fidelity and all claims for compensation should be denied him; and that he should be surcharged with the amount he received as an officer and Director of the Peoria Star and as chairman of the Board of the Peoria Newspapers, Inc.

██ Appellants, to sustain their position that Stone never was trustee because of his failure to file a bond, cite Bogert on Trusts, Vol. I–A, sec. 151, which states that there is considerable authority that a trustee is not a trustee until he files his bond. Appellee cites the paragraph following the above citation in the same textbook which states in substance that there are other decisions holding that he is in fact trustee although he filed no bond and that this condition is not a condition precedent to his being trustee. The textwriter further states that the latter view is a more sensible construction, and we agree with this. (See also *Daley v. Daley*, 300 Mass. 17, 14 N. E. (2d) 113; *Trustees of the Little Redstone Presbyterian Church v. Stephens,* 26 West. Co. L. J. 73. Stone was made trustee by the will and became trustee upon its admission to probate. On petition by appellants he would have been required to give bond or be removed. This was not done. In fact the appellants' counsel knew he was and had been acting as trustee and approved the decree whereby the circuit court took jurisdiction of the trust. He was a *de jure* trustee. Appellants cite *Huston v. Weed*, 242 Ill. App. 495. While this opinion does state that the filing of a bond is a condition precedent, an examina-

tion discloses that what was said on this point was *dictum* as the case was reversed because of lack of jurisdiction as to the beneficiaries of the trust. It follows from our view of the law on this subject as above announced that the failure of the trustee to file bond or make annual reports does not deprive him of his fees. The important thing is, is the present report correct? (*Wylie v. Bushnell,* 277 Ill. 484.) Appellants' objections as to lack of a bond and reports are without merit.

■ Appellants' objection that the fact that the trustee had advanced himself a portion of his compensation without order of the court would deprive him of fees, we also believe to be without merit. He had been surcharged with this amount and it would be indeed a harsh rule to hold that his collecting in advance a portion of his compensation that was justly due him, would deprive him of any compensation. This point was urged in the *Wylie* case above mentioned, and the court there held that this should not deprive the trustee of his compensation.

■ ■ Appellants' third objection is that the report of the trustee does not disclose an accurate account of his trusteeship and for lack of this all compensation should be denied him. There is no question but that the law requires the trustee to keep accurate accounts and that in the absence of such he will be denied his fees. (*Wylie v. Bushnell,* 277 Ill. 484.) Where there has been a negligent failure to keep trust accounts all presumptions will be against the trustee. (*In re Claim of Crimp v. First Union Trust & Savings Bank,* 352 Ill. 93; *Conant v. Lansden,* 409 Ill. 149; *Conant v. Lansden,* 341 Ill. App. 488.) In the *Wylie* case the court found that the trustee's report was not kept by the best bookkeeping standards but that if the report was honest and true and there was no evidence to the contrary it would be considered to be prima facie

correct. The court held that the material, form, or construction of the account was not important so long as it fairly showed the true statement of the account and for these reasons held it was not proper to remove the trustee. In the *Conant* case in the Appellate Court, it says on page 500 of the opinion:

"(9) In our opinion the true rule is this: where the trustee keeps and presents a complete account of his acts, a party objecting to any item has the burden of going forward with evidence to substantiate the objection. If competent evidence is produced which establishes the inaccuracy or illegality of any items, or renders them doubtful and obscure, then the burden of proof is upon the trustee to establish their validity, and it becomes a question of fact whether he has sustained his claim by a preponderance of the evidence."

██ The evidence disclosed by the record in the instant case shows that Stone as trustee submitted to the court a true and just account of his actions during his trusteeship. Two auditors for the appellee carefully checked over all details of receipts and disbursements and explained in detail the condition of the account. The auditors for the appellants also examined all records with reference to the account and we cannot find that they made any very serious objection to the accuracy of the substance of the accounts, although it was criticised as to form. We also do not commend the form of the report. The chancellor heard all this evidence and concluded that the account submitted was true and correct. No evidence was offered by appellants to contradict this. In view of the state of the record, as to this question, under the law, we believe the account was prima facie correct, and as no evidence was offered to controvert this, it was properly accepted as true and correct by the chancellor.

██ Appellants urge that from the period 1939 to 1944 the trustee was acting as executor and performed

237

no duties as trustee; hence he was not entitled to any compensation. As above noted Stone did not testify what services he performed. What these services were was largely ascertained from the testimony of E. V. Champion, George Z. Barnes, Clarence Zehr, and of the auditors. From their testimony it appears that after the will was admitted to probate, Stone then in fact was the trustee and as both trustee and executor, he proceeded to have himself elected president of the Peoria Star. This position was not new to him as he had in fact been operating the Star for a number of years. The Star was in a bad financial condition but it was imperative that Stone continue to operate it for the best interests of the trust. In view of this financial condition the trustee might have been considered derelict in his duties had he not taken over its management. The testimony discloses without contradiction that during the five-year period ending in 1943, Stone devoted about two-thirds of his time to the affairs of the Star and to the trust. It is true that the duties of an executor and trustee are in general separate and distinct. (*In re Estate of Mortenson,* 248 Ill. 520.) The offices, however, are not inconsistent and the person acting as trustee and executor may often be performing duties of both offices at the same time, and that is what happened here. (*Mannhardt v. Illinois Staats Zeitung Co.,* 90 Ill. App. 315.)

 In *Sueske v. Schofield,* 376 Ill. 431, the facts are somewhat parallel to the facts in the instant case. The question arose in that case whether the executor and testamentary trustee should account for a salary of $10,000 per year paid to him by a copper company. The stock in this company was a large part of the assets of the trust estate. Under the will the trustee was empowered to manage the copper company business according to his best discretion and to discontinue it, if he thought it best. The court found that the trustee

238

had conducted the business capably and paid a large amount of dividends to the stockholders; the business had increased greatly from year to year; Schofield, the trustee, had obtained the usual fees for those services from the assets of the trust. The court says: "It is evident from the will, that the testator contemplated Frank Schofield would be in complete charge of the company just as the testator had been in his lifetime." The court held that they saw no reason for ordering a trustee to account for any money he received as salary. In the instant case the trustee was surcharged with his salary for the five-year period. We see nothing wrong in his accepting the position as president of the Star, especially when he was surcharged.

■ In the case of *In re Peabody's Estate,* 218 Wis. 541, 260 N. W. 444, it was held that the trustees of a testamentary trust which places upon them the duty of conducting a business of a mercantile corporation owned largely by the estate, required them to act as officers of the corporation. By so acting, they were accountable as trustees. This case appears in 99 A. L. R. 956, to which is appended a note entitled, "Compensation of Testamentary Trustee for conducting business or taking active part in management of corporation." The cases on this subject are reviewed and in general indicate that where the trustee is engaged in carrying on an incorporated business for the trust, according to the terms of the will, the trustee's compensation will be limited to the amounts he receives as trustee, and extra compensation for his corporate functions is denied. There are contrary cases but these are based on the particular facts existing in those cases. *In re Berri,* New York, 130 Misc. 527, 224 N. Y. Supp. 466, the decedent owned practically all the stock of a publishing company which was the chief asset of the trust created by his will. One of the trustees was elected president and treasurer of the corpo-

239

 .

ration and received a salary by virtue of such offices. As trustee, prior to the death of the testator, he had been acting as advertising agent for the corporation. He continued to so act after the death of the testator. The court held that receipt of the salary was proper, that while there was no direction in the will to continue the business, the trustees were given permission to hold the stock as an investment, and that the testator must have contemplated that the trustee would be employed as an officer of the corporation to safeguard the value of the stock.

In *Turner v. Ryan,* 223 Iowa 191, 272 N. W. 60, it was held that a trustee who acted diligéntly and in good faith should not be deprived of his compensation because of improper items of expenditure where his account had been surcharged with such items. Appended to this case, reported in 110 A. L. R. 554, is a note entitled: "Compensation of trustee as affected by neglect or violation of his duties." Many of the cases reviewed in this note turn on the question of the nature of the neglect or violation by the trustee. It is stated on page 566 of this note:

"It is said in American Law Institute, Restatement of the Law of Trusts, par. 243d: 'If the trustee repudiates the trust or misappropriates the trust property, or if he intentionally or negligently mismanages the whole trust, he will ordinarily be allowed no compensation.' "

Cases illustrative of this rule denying compensation are *Lehman v. Rothbarth,* 159 Ill. 270; *Sauvage v. Gallaway,* 335 Ill. App. 35; *Victor v. Hillebrecht,* 339 Ill. App. 254. On the other hand by other cases reviewed in the note, if it appears that the trustee acted diligently and in good faith, that his dereliction was an error of judgment and there was no serious infraction of his duties, no loss to the trust, he will not be denied

240

his compensation. (See also the *Conant* cases above mentioned.)

O. P. Westervelt, attorney from Peoria, testified that he had large experience in the administration of testamentary trusts; that he had heard the testimony of Mr. Zehr and Mr. Barnes who testified as to what services Stone had performed and based on this testimony and his experience as to what are proper fees for the trustee, he formed an opinion as to the amount of the fees; that a reasonable fee for the services performed by Stone for the five-year period ending in 1943 was $10,000 per year. This opinion was also based on the fact that Stone had devoted two-thirds of his time to the business of the trust and executorship during that period. He further testified that the duties of the trust and the executorship were so intermingled and overlapped that he determined that the amount stated would be for all services rendered by Stone during this period; that Stone should be surcharged with the amount of his executor's fees and with his compensation received as president of the Star and also with the amount Stone had advanced himself for trustee's fees and that the net amount due Stone should be the same amount as fixed by the chancellor.

Sylvan Olson also testified on behalf of Stone and stated that he had been in charge of the Trust Department of the Commercial National Bank of Peoria since 1935; that he was acquainted with proper compensation for trustees. His testimony and his conclusions were largely the same as Westervelt's. No evidence was offered by appellants to controvert this testimony. Under the facts and circumstances surrounding this trust, the intermingling and overlapping of the duties as executor and trustee, we believe these witnesses' opinions as to the amount of the fees

241

.

and the manner in which they should be prorated and surcharged lawful and proper. We believe that the trustee should not be denied his compensation during the five-year period when he was also acting as executor. In view of the fact that the surcharges have been accepted by the trustee, he was in error as to some of them, under the law we do not believe his errors should deprive him of remuneration where the record discloses that at all times he was vigilantly and competently administering the affairs of the estate to the benefit of the beneficiaries. He carried the trust estate through a trying period without serious loss.

 For the above reasons we hold that the trustee should be permitted to receive compensation while he was acting as executor. Objection number four of appellants is not tenable. The amounts he received as executor were properly surcharged against him by the chancellor. Under the circumstances in this case the fact that Stone received a salary from the Peoria Star is not so unethical and improper as to prevent him receiving trustee's fees, especially when they are surcharged against him. While it is not decisive, it does bear comment here, that the record does not disclose at any time that the appellants made any objection to the actions of the trustee until his report was filed. It might be said that they are estopped by their actions.

 We now come to the fifth proposition urged by appellants. It is urged that Stone was guilty of self-dealing for his own profit, and therefore entitled to no compensation as trustee. As a general proposition, it is within the discretion of the chancellor whether the trustee who has committed a breach of trust shall receive full compensation, or whether his compensation shall be reduced or denied. The chancellor, in exercising his discretion, may consider whether or not the trustee acted in good faith, whether

242

the breach of trust was intentional, whether the breach of trust occasioned any loss, and whether or not the trustee's services were of value to the trust. (Restatement of the Law of Trusts, page 751.) The trial court found that the trustee was not guilty of any self-dealing, and when consideration is given to the evidence, we cannot reverse this finding by the trial court unless it be against the manifest weight of the evidence. Giving careful consideration to the record herein, we are of the opinion that the finding of the trial court that the trustee was not guilty of self-dealing is not against the manifest weight of the evidence.

 A more serious proposition is urged by appellants in the latter part of their objections. It is their position that because the trustee has been guilty of self-dealing, he should be surcharged with all moneys received by him in his capacity as chairman of the Board of Peoria Newspapers, Inc. The rule of law as announced by the weight of authority is that a testamentary trustee with express or implied authority to manage or participate in the management of a business or corporation if he deems it advisable while exercising good faith, sound judgment, and reasonable discretion, may manage the business or vote himself an officer of such corporation. If such position is obtained through his own act as trustee and he receives compensation therefor, he must account for same to the trust. His fiduciary duties come first for which he can rightfully be paid, but he cannot profit otherwise. (*Conant v. Lansden,* 341 Ill. App. 488; *Merchants Loan & Trust Co. v. Northern Trust Co.,* 250 Ill. 86; *In re Peabody's Estate,* 218 Wis. 541, 260 N. W. 444, 99 A. L. R. 96.) Although as heretofore indicated, the trustee was not guilty of self-dealing, we cannot believe that under the facts of this case the compensation received by the trustee in his capacity as chairman of the Board can be considered on any different basis than the com-

243

pensation received by him as president of the Peoria Star. His activities as president of the Peoria Star, as trustee, as chairman of the Board of Peoria Newspapers, Inc., were all so closely interwoven as to constitute but one single transaction. While it is urged by appellee that his compensation as trustee is fixed by the merger agreement, no such specific order was entered by the trial court in approving the merger agreement. It is agreed by the parties that Claude U. Stone received, while chairman of the Board the total sum of $194,107.15. Of this amount two-thirds was paid by the Peoria Journal. The trustee cannot be surcharged for that part of his compensation. That portion of this amount received by Stone while acting as trustee must be surcharged to him as compensation advanced in the same manner that the moneys received by him as president of the Peoria Star, his executor's fees, and the moneys advanced to himself as trustee were surcharged against his compensation as trustee for the period from January 1, 1939 to January 1, 1944. Stone resigned as trustee on July 17, 1949, and his successor, Barnes, was appointed by Stone on that day under the terms of the will. Stone received compensation as chairman of the Board from the time of his resignation on July 17, 1949 to April 15, 1950. Inasmuch as his status as trustee was terminated at the time of his resignation, he should not be surcharged for moneys received in his capacity as chairman of the Board after the date of his resignation.

 There is no reason under the law to consider the acts, duties, and compensations of the trustee during the period that he acted in the capacity as trustee, from January 1, 1939 to the time of his resignation, on a piecemeal basis. His activities and account during the full period were before the chancellor, and were properly considered by him. Equally so, the compensation to which he was entitled, if any, was

244

also before the chancellor for the full period, and was considered by the chancellor in order to properly determine all of the issues.

We therefore affirm the decree of the chancellor that for the period from January 1, 1939 to January 1, 1944 there was due and owing from the trust estate to Claude U. Stone as trustee, the additional amount of $10,923.75 for fees for that period of time. The record shows that from January 1, 1944 to July 17, 1949, the trustee received approximately the sum of $165,404.80 from Peoria Newspapers, Inc. We hold that he should be surcharged as above indicated for one-third of the amount he received as compensation received by him as chairman of the Board of Peoria Newspapers, Inc., from January 1, 1944 to July 17, 1949, the date of his resignation.

 Insofar as the statement in the decree of the chancellor that repayment should be made to the Peoria Star of certain advances to Helen Baldwin Smith and Margaret Baldwin Holley, such statement does not constitute an order against these parties for such repayment, and is a matter between Helen Baldwin Smith, Margaret Baldwin Holley, and the Peoria Star, and is consequently not before this court.

The decree in this case approving the report of Claude U. Stone, trustee, is therefore reversed and this cause is remanded to the circuit court of Peoria county with directions to surcharge the trustee with one-third of the amount received by Stone from Peoria Newspapers, Inc., from January 1, 1944 to the date of his resignation, and to enter an order consistent with the views expressed in the opinion.

*Affirmed in part, reversed in part, and remanded with directions.*

WOLFE and DOVE, JJ., concur.