Opinion by Judge WEBB.
¶ 1 In a protracted probate proceeding during which the value of the estate significantly increases, does the probate court's equitable power include making a compensatory increase to the surviving spouse's elective share? Addressing a question of first impression in Colorado, we conclude that the probate court erred in making such an equitable adjustment, which is the primary issue in this appeal. We also remand for further proceedings on the corporate governance (Part IV) and the disputed leases (Part IX.B) issues. In all other respects, the probate court's orders are affirmed.
I. Introduction
¶ 2 Sheldon Beren, who died testate in 1996, was the founder and sole shareholder of Berenergy Corporation. He had four sons with his first wife, who predeceased him: appellants David Beren, Zev Beren, Jonathan Beren, and Daniel Beren (four brothers). Decedent then married appellee, Miriam Beren (Mrs. Beren, who survived him), and adopted her two children: appellees and cross-appellants, Joshua Beren and Cheryl Beren Feldberger (who is now deceased). Decedent and Mrs. Beren had one biological child, appellee and cross-appellant Dena Beren Grossman (collectively, Miriam's children).
¶ 3 Decedent's will provided a life estate for Mrs. Beren and left the residuary estate to the seven children. It designated her and appellee Robert M. Goodyear, Jr. (who was the chief financial officer (CFO) of Berenergy) as co-personal representatives. After Mrs. Beren petitioned under section 15-11-205, C.R.S.2012, to take an elective share in lieu of the life estate, Goodyear became the sole personal representative and continues in that capacity.[1]
¶ 4 In 2001, Mrs. Beren petitioned the court to determine the value of the augmented estate and based on that value the amount of her elective share. The four brothers objected to her proposed calculation. This issue was tried in 2002 and 2003.
¶ 5 The probate court issued two orders in 2003. The first order primarily addressed what assets were to be included in the augmented estate and the value of those assets. The second order reaffirmed a prior ruling that, as a matter of law, Mrs. Beren was not entitled to interest on her elective share. However, the court found that "because the estate has experienced earnings during the pendency of this litigation," Mrs. Beren was entitled to an equitable adjustment, which would be allocated against the remaining beneficiaries pro rata.
¶ 6 The next six years of litigation focused on Goodyear's computation of the augmented estate and the elective share; the methodology *491 for computing the equitable adjustment; the amount of the equitable adjustment; and his proposed plan for distribution. Several issues in this appeal arise from the plan. In 2009, Goodyear filed his closing petition, which included his final compensation request. After several hearings, the probate court approved the plan and Goodyear's requested compensation. This appeal followed closure of the estate.
II. Disqualification
¶ 7 David Beren contends the probate court judge erred by not recusing from the entire case after having referred a single motion to a senior judge. This contention calls into question most of the probate court's rulings at issue. It is without merit.
¶ 8 A judge's decision whether to recuse will be reversed only for an abuse of discretion. Spring Creek Ranchers Ass'n v. McNichols, 165 P.3d 244, 245 (Colo.2007). Upon recusing, a judge loses jurisdiction to make any further rulings in the case. See Beckord v. District Court, 698 P.2d 1323, 1330 (Colo.1985).
¶ 9 Here, David Beren moved for an order directing the court reporter to prepare a transcript of the hearing on Mrs. Beren's elective share. The probate judge referred the motion to a senior judge because "the reporter referred to ... was an employee of this court prior to her retirement and because the court had conversations with said reporter about any preparation of transcripts prior to her retirement." Then David Beren moved the judge to recuse from the case completely, relying on Beckord. The judge denied the motion. We discern no abuse of discretion.
¶ 10 Beckord involved a judge who had recognized an appearance of impropriety and reassigned part of a consolidated action to another judge. The supreme court concluded that the judge had erred "in transferring only those parts of the actions which he perceived would be improper," because the "appearance of impropriety effectively disqualified him from ... deciding any issue in any of the cases." 698 P.2d at 1329.
¶ 11 In contrast, here the probate judge made no finding that ruling on the referred motion would have been improper. See People v. Lanari, 926 P.2d 116, 120 (Colo.App.1996) (no recusal required where "[e]ven though he could have decided the motion ... he, nevertheless, acting out of an abundance of caution, requested that the chief judge rule on this motion"); see also Comiskey v. District Court, 926 P.2d 539, 542 (Colo.1996) ("referral of the motion to the chief judge for decision does not require recusal of the trial judge").
¶ 12 Nor did the probate judge here find an appearance of impropriety. Comiskey, 926 P.2d at 542 (distinguishing Beckord because trial judge made no findings of impropriety); Lanari, 926 P.2d at 120 (same). Further, unlike in Beckord, here the court reporter's production of a transcript in no way implicated the merits of this case.
¶ 13 Accordingly, the probate court did not abuse its discretion by declining to recuse.
III. Equitable Adjustment to the Elective Share
¶ 14 The four brothers contend the probate court erred by awarding Mrs. Beren an equitable adjustment to her elective share based on appreciation and income to the estate during the prolonged administration. She responds that because the Colorado Probate Code (Code), sections 15-10-101 to - 17-103, C.R.S.2012, does not expressly preclude augmentation of a surviving spouse's elective share based on appreciation of, or income or interest earned by, the estate, the adjustment was within the probate court's broad equitable power under section 15-10-103, C.R.S.2012 ("[u]nless displaced by the particular provisions of this code, the principles of law and equity supplement its provisions"). We conclude that the adjustment was at odds with Code provisions which provide a precise and detailed mechanism for calculating the elective share, without regard to increases or decreases in the estate's value during administration, and another provision which addresses payment of probate income. Therefore, it must be set aside.
*492 ¶ 15 The probate court's interpretation of the Code is reviewed de novo. In re Estate of Reed, 201 P.3d 1264, 1267 (Colo.App.2008).
¶ 16 In 1999, the probate court rejected Mrs. Beren's request for interest on her elective share, because "requiring interest on the elective share is a legislative prerogative and it is improper for the court to graft onto legislative provisions specific instances that could have been addressed but were not." However, the court noted that it would "retain" its "equitable power to award moratory interest."
¶ 17 In 2003, the court observed that "because the estate has experienced earnings during the pendency of this litigation, equity requires the court provide Mrs. Beren an award of interest." Then in 2009, applying "principles of equity," the court awarded Mrs. Beren $24,501,457 based on a 17.46 percent "investment rate of return," compounded monthly on the undistributed balance of her elective share.
¶ 18 The court explained that it had directed the personal representative to:
[D]etermine values of the estate on May 1, 2000 and December 31, 2007 and calculate a rate of return during that period. It was the Court's intention that the calculation account for appreciation of assets and income to the estate over the selected period. The Court also intended that the calculation would result in a single sum that would be awarded to [Mrs. Beren] to adjust for the inequities occasioned by the delays in final distribution to her of the entire elective share.
(Emphasis added.) It observed that "decedent's children would be enriched at the expense of their mother" by delaying distribution of the elective share, forcing distribution of cash to Mrs. Beren, and reducing the value of the elective share "by increasing administrative expenses through delay and distribution." However, recognizing that the phrase "moratory interest" had "created confusion in the proceedings," the court used the phrase "equitable adjustment," which "more accurately reflects my intent."
¶ 19 The parties present opposing views of the equities underlying this award. Before turning to principles of equity for guidance, however, a court must determine if any provision of the Code displaces its authority to make such an award. Because in our view this authority has been displaced, we decline to address the equities.
¶ 20 "The General Assembly provided guidance in determining the legal standards that apply to situations not covered by the statutory scheme...." Lunsford v. Western States Life Ins., 908 P.2d 79, 85 (Colo.1995). Citing section 15-10-103, Lunsford held that a probate court should "look to principles of common law and equity for guidance" only in the absence of an applicable statutory provision. Lunsford, 908 P.2d at 85.
¶ 21 As pertinent here, the Code includes comprehensive provisions concerning the elective share. No provision expressly prohibits an equitable elective share adjustment. Nevertheless, we conclude that two sections of the Code displace a probate court's discretion to augment an elective share based on appreciation of and income to an estate during administration.
¶ 22 First, under section 15-11-201(1), C.R.S.2012, "[t]he surviving spouse of a decedent ... has a right of election ... to take an elective-share amount not greater than one-half of the value of the augmented estate...." The Code defines "value" as "fair market value as of the decedent's date of death." § 15-11-202(1)(a)(XII), C.R.S.2012. Thus, computing the elective share under section 15-11-201 results in a set dollar amount, or pecuniary amount, calculated as of the date of death, rather than a fraction of the estate when the assets are distributed and the estate is closed.[2]
*493 ¶ 23 Whether the surviving spouse's interest is a pecuniary amount or a fractional interest is important because:
If pecuniary-that is to say, a fixed dollar amount-the bequest will be unaffected by fluctuation of asset values during probate. If ... fractional-that is to say, a percentage of the decedent's property on the date of distribution-the widow's interest will be affected by appreciation or depreciation of asset values during probate.
In re Parker's Estate, 24 Mich.App. 158, 180 N.W.2d 82, 85 (1970) ; see Estate of McKee, 132 Misc.2d 562, 563, 504 N.Y.S.2d 394, 395 (N.Y.Sur.Ct.1986) ("If it is pecuniary, the beneficiary does not share in increases during administration; if it is fractional, then it does share."); Smail v. Smail, 617 S.W.2d 889, 892 (Tenn.1981) (spouse not entitled to appreciation of stock value occurring after testator's death, where bequest in marital trust was a pecuniary amount rather than a fraction); cf. Hanna v. Hanna, 273 Ark. 399, 619 S.W.2d 655, 658 (1981) (pecuniary bequest is "unaffected by appreciation or depreciation of the assets").
¶ 24 Section 15-11-201 protects the spouse who elects against a will from a decrease in the value of the estate during administration. As a corollary, in our view, such a spouse should not benefit from an increase in the value of the estate during administration. Therefore, the probate court's explanation that its equitable adjustment prevented the value of the elective share from being "frozen in time" ignores the protection against declining estate value achieved by a surviving spouse who elects against the will.
¶ 25 Had the legislature intended to allow augmentation of the elective share based on appreciation in estate value, as occurred here, the expected location for such a provision would be in section 15-11-202(2), C.R.S.2012. This section reflects a legislative judgment to avoid injustice to the surviving spouse by restoring certain assets or their value to the augmented estate. See In re Estate of Smith, 718 P.2d 1069, 1071 (Colo.App.1986) ("one of the purposes of the augmented estate provisions is to allow a surviving spouse, deprived of a share in the decedent spouse's estate by inter vivos transfers to third parties or other means, to claim an elective share of property deemed includible in the augmented estate"). However, none of the specific augmentation provisions uses a value after the date of the decedent's death, which would encompass appreciation. Further, the lengthy comment to title 15, article 11, part 2, does not address inequity to the surviving spouse who has chosen an elective share resulting from appreciation in estate value, although the comment recognizes several other inequities and describes the remedies provided.
¶ 26 Second, under section 15-1-467(1), C.R.S.2012, the "executor shall, at the time of distribution, pay over" any net probate income to trustees and legatees. The definition of "net probate income" would include the income to the estate that here the probate court directed the personal representative to calculate. See § 15-1-453(1)(c), C.R.S.2012. Neither any provision of the Code nor any Colorado case suggests that a spouse who has elected against a will is a trustee or a legatee. See Black's Law Dictionary 980 (9th ed. 2009) (a legatee is "[o]ne who is named in a will to take personal property; one who has received a legacy or bequest"). Therefore, under section 15-1-467, a spouse who choses an elective share is not entitled to any net probate income. See Sheridan Redevelopment Agency v. Knightsbridge Land Co., 166 P.3d 259, 263 (Colo.App.2007) ("We are not free to add language to a statute."); see also Williams v. Harrington, 460 So.2d 533, 537 (Fla.Dist.Ct.App.1984) (rejecting claim for equitable adjustment to elective share because, "For us to embark upon the task-and to, in effect, call upon trial courts in like situations to embark upon the task-of adjusting the statutory scheme to accommodate perceived equities would, we believe, not be a proper judicial role."). Thus, insofar as the probate court's equitable adjustment included "income to the estate over the selected period," that portion of the award is contrary to section 15-1-467 because by paying income to Mrs. Beren, the court precluded paying it to the children, who were "legatee [s] of a present, legal, possessory interest in any portion of the residue." § 15-1-467(1)(c), C.R.S.2012.
*494 ¶ 27 Both of these provisions indicate that an elective share is a set pecuniary amount which neither increases nor decreases based on changes in the value of the estate during administration. The resulting protection of an electing spouse against post-death decreases in estate value would be difficult to reconcile with an implied power to award an equitable adjustment based on increases in the estate value. This anomaly might be avoided by recognizing a correlative power to make an equitable adjustment that decreased the elective share to reflect declining estate value. But such a fluid approach would render the "date of death" limitation on value meaningless.
¶ 28 Equitable adjustments would also frustrate "ease of administration and predictability of result," which "are prized features of the probate system." Tit. 15, art. 11, pt. 2 gen. cmt., C.R.S. 2012. Here, the equitable adjustment made by the probate court illustrates problems as to both.
¶ 29 First, the adjustment expanded the proceedings below, and is the core of this appeal. The court had to decide on a date range for the adjustment, without any statutory reference points. The factors for determining appreciation and income, which also lack any statutory basis, were and are disputed. Second, the multifaceted nature of the adjustment leaves the amount of Mrs. Beren's elective share, and as a consequence the value to be realized by the residuary beneficiaries, unknown and unknowable from 2003, when the court first discussed the adjustment, until final resolution of proceedings on remand arising from this appeal.
¶ 30 Mrs. Beren's emphasis on Lunsford is unpersuasive. There, the supreme court held that the so-called "slayer statute," now codified at section 15-11-803, C.R.S.2012, did not shield an insurer from a common law claim that it had been negligent in paying life insurance proceeds, under suspicious circumstances, to a beneficiary who turned out to have killed the insured. The court relied on two established common law principles: a slayer cannot benefit from a wrongful act and an insurer owes a duty of care in disbursing policy proceeds. The court discerned no contradiction between these principles and the slayer statute, which prohibits an insurer from paying policy proceeds only if, before payment, a contingent beneficiary gives the insurer notice that the primary beneficiary has been convicted of or pled guilty to murder or manslaughter of the insured. Construing the statute strictly, the court concluded that because it "is silent regarding a [primary] beneficiary's entitlement to insurance proceeds in other situations," 908 P.2d at 83, the court recognized "the duty of an insurer to disburse policy proceeds reasonably absent explicit legislative direction to the contrary." 908 P.2d at 87.
¶ 31 Here, in contrast, the Code is not "silent" concerning calculation of the elective share. Nor are the elective share provisions subject to strict construction.[3]
¶ 32 Several other states have held that where the elective share is a fractional interest, the electing spouse will share in the increases-and sometimes be vulnerable to decreases-in estate value occurring between death and distribution. See Charles C. Marvel, Annotation, Extent of Rights of Surviving Spouse Who Elects to Take Against Will in Profits of or Increase in Value of Estate Accruing After Testator's Death, 7 A.L.R.4th 989 (1981). However, two states whose statutes, like the Code, provide pecuniary amounts for elective shares have rejected adjusting the elective share to account for such increases. See Paredes v. McLucas, 561 So.2d 439, 440 n. 1 (Fla.Dist.Ct.App.1990) ("The elective share is computed as an amount based upon the fair market values on date of death, therefore, once determined, this amount does not increase or decrease as *495 the estate asset values change during administration." (quoting Platt, Administration of the Estate, Basic Probate and Guardianship Practice Seminar § V (Elective Share), at 3.14)); In re Kasenetz, 196 Misc.2d 318, 321, 765 N.Y.S.2d 216, 218 (N.Y.Sur.Ct.2003) ("the elective share is a pecuniary amount computed at the time of death, it does not participate in increases and decreases to the estate during administration").
¶ 33 Mrs. Beren's reliance on Estate of Smith, 718 P.2d at 1074, as recognizing the probate court's discretion to make an equitable adjustment to an elective share, is misplaced. There, the estate of the surviving spouse, who had died during the probate proceedings, sought compensation "for increases accruing to the value of estate property from the date of [decedent's] death." Id. The trial court "provided such compensation in the form of an award of interest," based on its equitable powers. Id. Estate of Smith is distinguishable, for two reasons.
¶ 34 First, when Estate of Smith was decided, Colorado's elective share statute did not provide for a pecuniary amount. Instead, as discussed above, the prior version of section 15-11-201 provided "the surviving spouse has a right of election to take a fraction of the augmented estate," which was valued on the date of distribution. See Ch. 186, sec. 1, §§ 15-11-201(1), 15-11-207(3)(b), 1981 Colo. Sess. Laws 911, 913.
¶ 35 Second, in Estate of Smith, the parties did not dispute the probate court's authority to adjust the elective share. Instead, they contested only the date range for the interest calculation. 718 P.2d at 1074 ("Ruth's estate agrees that an award of interest is proper, but argues that ... interest should have run from the date of ... death").
¶ 36 In sum, we conclude that the probate court erred when it made an equitable adjustment to Mrs. Beren's elective share to compensate her for income to, and appreciation in the value of, the estate.
¶ 37 Nevertheless, and despite the probate court's clarification that it was awarding an equitable adjustment rather than moratory interest, Mrs. Beren argues that her award was proper as moratory interest. We reject this argument, for the following reasons.
¶ 38 In Colorado, interest is "a creature of statute." Farmers Reservoir & Irrigation Co. v. City of Golden, 113 P.3d 119, 132 (Colo.2005). Under section 15-12-904, C.R.S.2012, "General pecuniary devises bear interest at the legal rate beginning one year after the first appointment of a personal representative until payment...." (Emphasis added.) "Devise" means "a testamentary disposition of real or personal property." § 15-10-201(12), C.R.S.2012. A surviving spouse's elective share is an alternative to a will, and thus cannot be a "testamentary disposition."[4] Cf. Cobb v. Estate of Stratton, 56 Colo. 278, 284, 138 P. 35, 38 (1913) (rejecting common law award of interest on legacy, because, "The subject of interest is governed in this state by statute, and in no case where interest is not so provided is it recoverable, unless specially contracted for, except in the nature of damages, where a refusal to pay has been willful, wrongful, fraudulent or without reasonable cause, and no such claim is advanced in this case.").
¶ 39 Although Colorado law recognizes interest as damages or "moratory interest," even where-as here-not recoverable under a statute, such an award usually constitutes damages for the wrongful withholding of money. Farmers Reservoir, 113 P.3d at 133 ; see § 5-12-102, C.R.S.2012; see generally Davis Cattle Co. v. Great W. Sugar Co., 393 F.Supp. 1165, 1186 (D.Colo.1975) (discussing annotations and Colorado case law permitting moratory interest), aff'd, 544 F.2d 436 (10th Cir.1976). Even where the award is equitable, it "deters further wrongful delay of payment." Safeco Ins. Co. v. Westport Ins. Corp., 214 P.3d 1078, 1080 (Colo.App.2009) (internal quotation omitted). But here, the probate court did not find that any of the *496 parties had wrongfully withheld the elective share and it rejected the idea that its award of moratory interest was "some sort of punitive sanction [ ] (targeting the 'bad people' and rewarding the 'good people')."
¶ 40 Moreover, other than Estate of Smith, no Colorado case has awarded moratory interest absent a wrongful withholding. In this regard, Estate of Smith relied on Heller v. First National Bank, 657 P.2d 992 (Colo.App.1982), as support for probate court discretion to award interest independent of a statute. However, Heller was a breach of trust action that necessarily involved wrongful conduct. And to the extent Estate of Smith, 718 P.2d at 1074, upheld an award of moratory interest on an elective share-notwithstanding lack of wrongful withholding-the case is distinguishable for the reasons set forth above.[5]
¶ 41 Accordingly, we conclude that the probate court erred in awarding Mrs. Beren an equitable adjustment to her elective share for appreciation of and income to the estate during its administration.[6] Even if the better policy may be recognizing a probate court's power to make such an equitable adjustment under unusual circumstances, an appropriate statutory change could be made in language that can be "quickly and easily understood." People v. District Court, 161 Colo. 14, 24, 420 P.2d 236, 241 (1966). However, "[c]ourts must avoid making decisions that are intrinsically legislative. It is not up to the court[s] to make policy or to weigh policy." Town of Telluride v. Lot Thirty-Four Venture, L.L.C., 3 P.3d 30, 38 (Colo.2000).
IV. Corporate Governance Plan
¶ 42 The four brothers next contend the probate court erred in approving that portion of the distribution plan which modified the corporate structure of Berenergy by creating two classes of stock: 4,000 shares of class A to be distributed to the four brothers and 3,000 shares of class B to be distributed to Miriam's children. We conclude, as a matter of law, that the two classes are unequal in voting rights. Because the plan did not offset this inequality with additional monetary or in-kind distributions, and Goodyear did not present any evidence showing that the actual difference in value from this legal inequality was de minimis, we reverse the approval of that portion of the plan.
A. Standard of Review
¶ 43 The probate court "has jurisdiction to determine every legal and equitable question arising in connection with decedents' ... estates ... [and to] partition any of the real or personal property of any estate in connection with the settlement thereof." § 13-9-103(3)(c), C.R.S.2012; see also In re Estate of Stoiber, 101 Colo. 192, 199-200, 72 P.2d 276, 279 (1937) (referencing that suits against the administrator of a decedent's estate are suits in equity). Equitable remedies fashioned by a court are reviewed for an abuse of discretion. McNamara v. Mossman, 230 P.3d 1286, 1288 (Colo.App.2010). A court abuses its discretion when its ruling is "manifestly arbitrary, unreasonable, or unfair, or based on an erroneous view of the law." People v. Mollaun, 194 P.3d 411, 416 (Colo.App.2008). Interpretations of law are reviewed de novo. McIntire v. Trammell Crow, Inc., 172 P.3d 977, 979 (Colo.App.2007).
B. Law
¶ 44 If a will does not specify how to distribute a class gift among class members, the Code requires distribution as if the class members took in intestacy. § 15-11-708, C.R.S.2012. Under intestacy, a decedent's children inherit "per capita at each generation," § 15-11-103(2), C.R.S.2012, requiring *497 that each child receive an "equal share" of the estate. § 15-11-106(2), C.R.S.2012. Provided that this underlying equality is maintained, the residuary estate may be distributed in cash or in kind. § 15-12-906(2), C.R.S.2012.
¶ 45 The Code uses fair market value to determine the value of in-kind distributions. While neither section 15-11-106(2) nor section 15-12-906(2) specifies the method of valuation, as noted, the Code defines the value of an augmented estate as its "fair market value," § 15-11-202(1)(a)(XII), and a fiduciary is empowered to make in-kind distributions in accordance with "fair market value." § 15-1-804(2)(u), C.R.S.2012. Throughout the Code, fair market value is the default method of valuation. See § 15-12-706(1), C.R.S.2012 ("[A] personal representative ... shall prepare an inventory of property owned by the decedent and subject to disposition by will or intestate succession at the time of his death, listing ... its fair market value ...."); § 15-12-1402(8), C.R.S.2012 (defining "value" under part fourteen of the Probate Code as "fair market value"); Pueblo Bancorporation v. Lindoe, Inc., 63 P.3d 353, 362 (Colo.2003) (using the Code as an example of the General Assembly defining "value" as "fair market value"). Interpreting statutory provisions to be consistent with the legislative scheme as a whole, Devora v. Strodtman, 2012 COA 87, ¶ 9, 282 P.3d 528, we conclude that sections 15-11-106(2) and 15-12-906(2) likewise require in-kind distributions to be valued according to their fair market value.
¶ 46 Fair market value refers to "the price that would be agreed upon by a willing seller and willing buyer under no compulsion to sell or buy." Walter S. Cheesman Realty Co. v. Moore, 770 P.2d 1308, 1311-12 (Colo.App.1988) ; accord Lindoe, 63 P.3d at 362. When applying this standard, courts have recognized the difficulty in valuing assets where no market exists, as with close corporations. See, e.g., Van Schaack v. Van Schaack Holdings, Ltd., 856 P.2d 15, 23 (Colo.App.1992), aff'd, 867 P.2d 892 (Colo.1994). In these cases, "[a] proper determination of the fair market value of a corporation's shares depends upon the particular circumstances of the corporation involved. The court must consider all relevant value factors...." Id.; cf. Lindoe, 63 P.3d at 361 (stating that discounts based on factual circumstances are appropriate when determining fair market value that would not be appropriate otherwise).
C. Application
¶ 47 Decedent's will gave his residuary estate, including Berenergy, to his "issue that survive[d]" him. However, the will did not apportion the residuary estate among the class members, all of whom were of the same generation. Thus, Goodyear created the distribution plan to divide this residuary estate equally.
¶ 48 Under the plan, the estate would be distributed pro rata to the residuary beneficiaries-the seven children-but "subject to a corporate governance structure intended to insure that neither of what has turned out to be two 'sides' of the family is placed in a minority position." All shares of stock to be distributed would participate equally in profits and liquidation proceeds. However, the voting rights differed because the 4,000 class A shares could elect one director and the 3,000 class B shares could elect one director. Those directors would then choose a third, or "neutral," director.
¶ 49 At the hearing on the plan, the four brothers argued that the distribution was unequal, as a matter of law, because their shares would have lesser voting rights. However, they presented no evidence of how, if at all, the lesser rights affected the value of these shares. Nor did Goodyear present any such evidence. Instead, he explained that because the four brothers were allied with each other, as were Miriam's children, this structure prevented the four brothers from using their collective control of the company to disadvantage Miriam's children.
¶ 50 In approving the Plan, the probate court made no specific findings concerning either the change in corporate structure or the difference in value, if any, between shares in the two classes. However, the court found that the plan complied with both the will and the Code.
*498 1. Consideration of Minority Interest Oppression
¶ 51 The four brothers argue that neither Goodyear nor the probate court has any power to manipulate voting rights to protect any group of minority shareholders from oppression by the majority. We have not found any Colorado authority empowering a personal representative or a probate court to consider possible oppression of minority interests, nor has Goodyear or Miriam's children cited any such authority. The absence of authority weighs against departing from the Code's requirement of equality in distribution to mitigate the risk of oppression.
¶ 52 Further, here the oppression concern may be ephemeral. While during much of the estate administration, the four brothers would take one position and Miriam's children would take the opposite position, the probate court did not hear any evidence that these alignments would continue. Alone, each child will always be a minority shareholder. And however the children may align in the future, four or more of them will always constitute the majority and three or fewer of them will always be in the minority. Thus, if the alignment changes, the corporate structure designed to prevent oppression of Miriam's children will cease to be effective.
¶ 53 Therefore, because the will requires equal distribution of the residuary estate to the seven children, and does not mention protecting minority shareholders, we conclude, as a matter of law, that inequality in voting rights is not justifiable based on concerns over oppression of minority shareholders, for which other remedies may exist. See generally Polk v. Hergert Land & Cattle Co., 5 P.3d 402, 404-05 (Colo.App.2000) ("The definition of oppressive conduct is intended to be broad and flexible. In the context of a close corporation, oppressive conduct of those in control is closely related to breach of the fiduciary duty owed to minority shareholders.").
2. Inequality of Shares' "Fair Market Value"
¶ 54 The four brothers argue that the distribution was unequal because the class A shares have lesser voting rights than the class B shares. While the difference in voting rights is indisputable, both Goodyear and Miriam's children respond that this difference does not affect value. Addressing the value question is confounded because no evidence of value was presented and the probate court made no findings concerning value. Nevertheless, we conclude, also as a matter of law, that because the difference in voting rights affected the fair market value of the shares, thus making shares in the two classes unequal, further proceedings are required.
¶ 55 The probate court found that the distribution plan followed both the will and the Code, both of which require division into shares of equal fair market value. See supra Part IV.B. As the shares differ only with respect to their voting rights, the probate court necessarily considered the difference in voting rights irrelevant to fair market value under the Code, as a matter of law. Absent any evidence of value, this application of the fair market value standard is incorrect.
¶ 56 When deciding fair market value, courts must look to all factors relevant to a hypothetical willing buyer and a willing seller. See supra Part IV. B. If two items are of equal fair market value, a willing buyer would be ambivalent as to which item the buyer received for the price. Conversely, a willing seller would request the same price for both items. If two items differ in a way that would cause a willing buyer to prefer one over the other, or a willing seller to price them differently, the two items do not have equal fair market values.
¶ 57 The voting rights associated with a particular share of stock could impact the price assigned by a hypothetical willing buyer and seller because courts have recognized that a share's voting rights have value. See Hertz Drive-Ur-Self Sys. v. Doak, 94 Colo. 200, 203, 29 P.2d 625, 626 (1934) (finding mandamus an appropriate extraordinary remedy, given the "importance and value of the right to vote corporate stock"). Both the professional community, see, e.g., American Society of Appraisers, ASA Business Valuation Standards 47 (2009) (urging consideration of the impact various factors have on *499 "degree of control" when valuing partial interests in corporations), and federal tax authorities, see Treas. Regs. 20.2031-1(b), 20.2031-2(f)(2) ; Rev. Ruls. 59-60, 83-120, also consider voting rights to be a part of a share's fair market value. Thus, a difference in voting rights of shares is a relevant factor that should be considered when determining fair market value. As it was not here, the probate court abused its discretion in approving this portion of the plan by misapplying the law.
¶ 58 Nevertheless, Goodyear argues that value should be determined strictly according to proportionate interest in the corporation. But proportionate interest in a company is not synonymous with "fair market value" because the latter is broader than the former. See Lindoe, 63 P.3d at 360-61 (declining to apply discounts appropriate under "fair market value," as the particular statute called for valuing according to proportionate interest, and the two terms have different meanings). Thus, "fair market value" considers more than proportionate interest in the corporation.
¶ 59 Furthermore, whether a minority discount may apply here is irrelevant. Goodyear argues that courts should only apply minority discounts when one stockholder has a controlling interest in the corporation, which is not present in Berenergy. However, we need not consider which particular discounts are applicable, nor do we suggest the respective values of the two classes of stock. We hold only that because voting rights are a component of "fair market value" in the market place, and hence under the Code, providing no compensation reflecting the difference in these rights rendered the in-kind distribution of shares among the children unequal, as a matter of law.
¶ 60 Nor are we willing to resolve this question based on Goodyear's assertion that, as objectors, the four sons bore the burden of proving that unequal value was more than de minimis, given that Berenergy is a close corporation and each child holds a minority interest. The Code is silent on whether a personal representative, as proponent of a distribution plan, or an objector, bears the burden of proving equal value. However, even if we assume the four brothers bore that burden, cf. § 15-12-407, C.R.S.2012 ("Contestants of a will have the burden of establishing ..."), we conclude that they met this burden with their legal argument that the shares were unequal, as a matter of law, thus shifting the burden of going forward with evidence of value to Goodyear.
¶ 61 Accordingly, we reverse the probate court's order to the extent that it approved distribution of the two classes of shares, and we remand for further proceedings. Cf. In re Estate of Holmes, 821 P.2d 300, 305 (Colo.App.1991) (remanding when the court does not make a specific finding that personal representative followed relevant factors in determining future attorney fees and the personal representative's decision is disputed). On remand, the court shall require Goodyear (or his successor) to either present evidence of value concerning the two classes of stock, which the four brothers shall be allowed to dispute, or propose a modified plan concerning distribution of stock in Berenergy. By remanding generally, we take no position on what form a modified plan should take. See Musgrave v. ICAO , 762 P.2d 686, 688 (Colo. App. 1988) ("A general remand authorizes the trial court to make new findings and conclusions so long as there is no conflict with the ruling of the appellate court."). However, if the modified plan cancels the two share classes and, instead, distributes pro rata a single class of shares that the probate court determines are identical, the court shall approve the plan and issue any orders necessary to implement it. Any party may request a hearing to dispute whether the shares are identical. And if the plan provides for distribution of additional value to the four brothers, as compensation for the inferior voting rights of the class A shares, at the request of any party the court shall hold a hearing on value.
V. Personal Representative Compensation
¶ 62 David Beren next contends the probate court erred by approving Goodyear's compensation request because it was "based on the value of the estate, rather than on the work actually performed." We discern no abuse of discretion.
*500 ¶ 63 Determining the reasonableness of compensation for services performed by a personal representative is within the sound discretion of the probate court, and its award will be disturbed only for an abuse of discretion. In re Estate of Musso, 932 P.2d 853, 857 (Colo.App.1997).
¶ 64 "A personal representative is entitled to reasonable compensation for his or her services." Ch. 249, sec. 5, § 15-12-719(1), 2001 Colo. Sess. Laws 888. In reviewing the reasonableness of a compensation request, a probate court should consider:
(a) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the service properly; (b) The likelihood, if apparent to the personal representative, that the acceptance of the particular employment will preclude the person employed from other employment; (c) The fee customarily charged in the locality for similar services; (d) The amount involved and the results obtained; (e) The time limitations imposed by the personal representative or by the circumstances; ... [and] (g) The experience, reputation, and ability of the person performing the services.
§ 15-12-721(2)(a)-(e) & (g), C.R.S.1973 (repealed in 2011); see In re Estate of Painter, 39 Colo.App. 506, 508, 567 P.2d 820, 822 (1977) (factors are not exclusive).
¶ 65 Here, at the onset of the administration, Goodyear set his compensation at $375,000 annually-$125,000 over his prior salary as the CFO of Berenergy. In approving Goodyear's annual compensation, the probate court indicated that it would consider a retrospective increase. By 2010, Goodyear had received compensation of approximately $5,500,000, to which the parties did not object.
¶ 66 Goodyear sought additional compensation of $10,250,000 for his services from 1996 through June 30, 2010, and an annual salary of $1,553,908.32 from July 1, 2010 to the date of discharge. David Beren objected to any additional compensation. As the probate court observed, the other parties held a "nearly unanimous position" that Goodyear should "receive substantial additional compensation."
¶ 67 Following an evidentiary hearing at which only Goodyear presented expert testimony, the probate court approved Goodyear's compensation request. It concluded:
[T]he additional final compensation approved herein is unique precisely because this estate administration was unique. Thus application of the factors set forth in § 15-12-721 to the unique facts of this case, along with consideration of the other unique factors identified above ... leads the Court to find that, in the circumstances of this case, the approved additional final compensation, while undeniably material, is both appropriate and reasonable.
The court noted its "equitable powers to compensate a PR who devotes the most productive years of his career to the successful administration of an estate." It explained that "[t]o the extent that the statute allows the Court to give weight to this factor, the Court has given considerable weight to this one," adding:
This estate has no parallel in the Court's experience to which it can be compared to determine "similar services" or "customary charges." ... The fact that the PR maintained Berenergy and the other closely-held business interests for 14 and a half years while withstanding the unrelenting abuse of the Decedent's heirs and that the results of his management have been successful or wildly successful, depending on whose opinion one accepts, cannot be understated in considering that he is now requesting a fee in the range of fees customarily charged in the locality for similar services.
See In re Estate of Breeden v. Gelfond, 87 P.3d 167, 173 (Colo.App.2003) (personal representative entitled to requested fee because it was "reasonable based on time and amounts typical in the community").
¶ 68 David Beren did not present evidence contrary to the probate court's findings that:
• "Goodyear has devoted the entirety of his working life for 14 and a half years to this estate administration, including the day-to-day management of Berenergy and the other oil and gas interests and entities that make up this estate."
*501 • Goodyear "by virtue of his acceptance of the appointment as PR and employment as CEO of Berenergy, has had no opportunity to engage in any other meaningful employment for the last 14 and a half years."
• "By accepting this appointment [Goodyear] was precluded from any other employment."
¶ 69 Instead, relying on Estate of Painter, David Beren argues that Goodyear's compensation was improperly based on a percentage of the estate's value rather than on services performed. In support of this argument, he correctly points out that Goodyear requested compensation of .9 percent of the estate's value, and that the expert report presented by Goodyear included compensation schedules from several Denver institutional asset managers, all based on varying percentages of the assets under management.
¶ 70 In Estate of Painter, 39 Colo.App. at 508, 567 P.2d at 822, the division rejected the "percentage method" of calculating compensation, which is "based upon the premise that the amount of work required in estate administration is directly proportional to the value of the assets." It explained "that the duties of a personal representative ... vary greatly depending upon numerous factors, only one of which is the monetary value of the estate"; and a court "must consider and weigh all of the factors" in section 15-12-721 to determine reasonable compensation. Id. at 508-09, 567 P.2d at 822-23.
¶ 71 Here, the probate court's order approving Goodyear's compensation conformed to Estate of Painter. The court acknowledged:
• "[P]robate courts in Colorado cannot simply order a valuation of the estate, apply a fee schedule, and order that a percentage or share of the estate be paid to the PR as a fee."
• "Instead, in Colorado, the Court must review the factors set out in § 15-12-721 and apply those factors to the estate administration to determine the reasonableness of the compensation determined by the personal representative for his own services."
Then the court "applied and analyzed each of the § 15-21-721 factors in the context of this case, plus a myriad of other relevant considerations, to determine if the total compensation requested by [Goodyear] is reasonable."
¶ 72 The report of Goodyear's expert supported the court's approach by providing an analysis of how these factors applied to this estate. Although the report also included institutional fee schedules based on "a percentage-of-assets formula," it noted that application of such a formula "produces a dollar amount to consider along with the other statutory factors." The probate court relied on the expert report only in considering the third statutory factor-the fee customarily charged in the locality for similar services. And it did not adopt any of the fee schedules from the report.
¶ 73 Thus, although the probate court approved Goodyear's total compensation as a percentage of the estate, it did not arbitrarily base this compensation on a percentage calculation. Nor did Goodyear present such an arbitrary request. Rather, after explaining in detail his activities on behalf of the estate, he presented a range of percentages from which his compensation could be calculated. See In re Estate of Santarelli, 74 P.3d 523, 526 (Colo.App.2003) (fees based solely on a percentage of the estate's assets are improper only "absent further justification").
¶ 74 Nevertheless, David Beren argues that the probate court should have used a lodestar calculation-the number of Goodyear's hours multiplied by a reasonable hourly rate-to determine Goodyear's compensation. Although this method is commonly used to determine reasonable attorney fees, see Payan v. Nash Finch Co., 2012 COA 135M, ¶ 17, 310 P.3d 212, David Beren cites no authority, nor have we found any in Colorado, applying it to determine the compensation of a personal representative. Doing so here would be anomalous because Goodyear is not an attorney.
¶ 75 The probate court explained that although Goodyear did not "maintain [ ] time sheets or other records of his time spent on estate administration tasks including management of Berenergy," this occurred "because [Goodyear] has had no other occupation."
*502 Thus, the "time and labor required" for Goodyear to act as the personal representative "was complete." The court also found that it would be "impossible to calculate or estimate what portion of the last decade alone has been devoted to the conflict among the family members...." Because the record supports these findings, we agree with the court's conclusion that a lodestar calculation was unworkable.
¶ 76 In sum, because the probate court evaluated each of the appropriate statutory factors and made specific factual findings regarding the reasonableness of the fees, which are supported by the record, we may not reweigh the evidence on appeal. See In re Estate of Romero, 126 P.3d 228, 231 (Colo.App.2005) (a probate court's factual findings supported by the record are invulnerable on appeal). Accordingly, the probate court did not abuse its discretion in approving Goodyear's compensation request.
VI. Contribution Liability
¶ 77 David Beren next contends the probate court erred by approving the distribution plan because, allegedly contrary to a prior settlement, his $1,000,000 bequest was subject to contribution for liabilities including but not limited to the equitable adjustment to the elective share. We decline to review this contention because it was not sufficiently brought to the probate court's attention.[7]
¶ 78 Goodyear's final plan of distribution contained a schedule whereby each of the decedent's $1,000,000 bequests to his children, including David Beren, was subject to contribution to fund the elective share. David Beren made numerous arguments in his objections to the final petition, but he did not assert that the plan improperly subjected his bequest to contribution.
¶ 79 On appeal, to show that the issue was preserved, David Beren relies on a footnote in his objections where he "expressly reserv[ed] all objections and challenges that he ha[d] made." He then points to a single sentence in a pro se filing two years earlier, where he argued:
[I]t must also be remembered that in ... return for admission of the will into probate and various other benefits, the spouse who elected against the will agreed that the sons would receive their full million dollar devises, and consequently, the spouse cannot seek contribution against such devises.
¶ 80 The voluminous filings in this case over the course of fourteen years made it incumbent on David Beren to raise any specific objections he had to the final distribution plan. A vague reference in a footnote to prior objections was not sufficient to alert the probate court to his prior settlement argument. See Bloom v. Nat'l Collegiate Athletic Ass'n, 93 P.3d 621, 623 (Colo.App.2004) (reference to a claim in a footnote "insufficient to warrant review").[8]
VII. Administrative Expenses
¶ 81 David Beren next contends the probate court erred in approving the distribution plan because it did not properly allocate estate tax to the elective share, nor did it treat certain expenses as administrative expenses under section 15-11-202(2)(a), which are deducted from the augmented estate before calculating the elective share. We discern no error.
A. Estate Taxes
The probate court instructed Goodyear that:
No portion of estate tax is to be allocated to the elective share. The entire estate tax is properly allocated to the residuary estate and to the non-probate transfers *503 included in the gross estate that generated estate tax ....
¶ 82 David Beren argues that the court should have subtracted the estate taxes from the augmented estate before calculating the elective share. Although somewhat unclear, his argument seems to be that estate taxes are administrative expenses. This argument is unpersuasive because the practical effect of treating estate taxes as administrative expenses and deducting them from the augmented estate, before calculating the elective share, is to apportion those taxes to the elective share. For the following reasons, such a result is contrary to the Code.
¶ 83 Section 15-12-916, C.R.S.2012, governs the "Apportionment of estate taxes." It provides that in
instances involving [an] ... election, if the decedent's will or other dispositive instrument directs a method of apportionment of tax different from the method described in this code, the apportionment of tax to the ... surviving spouse shall be in accordance with the method described in this code, and the apportionment of tax to the remaining persons interested in the estate shall be in accordance with the method described in the will or other dispositive instrument.
§ 15-12-916(2) (emphasis added). The Code also provides that "[i]n making an apportionment, allowances shall be made for any exemptions granted, any classification made of persons interested in the estate, and for any deductions and credits allowed by the law imposing the tax. " § 15-12-916(5)(a) (emphasis added). Further, "[a]ny exemption or deduction allowed by reason of the relationship of any person to the decedent ... inures to the benefit of the person bearing such relationship ...." § 15-12-916(5)(b) (emphasis added).
¶ 84 Here, Mrs. Beren's elective share was shown as a marital deduction on Schedule M of IRS Form 706 Estate Tax Return. See 26 U.S.C. § 2056(a) ( "the value of the taxable estate shall ... be determined by deducting from the value of the gross estate an amount equal to the value of any interest in property which passes or has passed from the decedent to his surviving spouse"). David Beren does not contest deductibility of the elective share for estate tax purposes. Thus, because this deduction "inures to the benefit" of Mrs. Beren under section 15-12-916(5)(b), Goodyear properly calculated the elective share before apportioning the estate tax to the remainder of the estate. See In re Estate of Shapiro, 380 N.W.2d 796, 801 n. 1 (Minn.1986) (noting that "a majority of state supreme courts have concluded that the share of a surviving spouse should be calculated before federal estate taxes are computed") (collecting cases); Bogert, The Law Of Trusts And Trustees § 286.5 (2d ed. 1993) ("Often the courts have held that the marital gift, or the statutory share elected against the will by the surviving spouse, is not to be reduced by payment of taxes, because the gift constituted a deduction and did not contribute to tax liability." (footnotes omitted)).
¶ 85 We reject David Beren's argument that notwithstanding this majority rule, the General Assembly intended to apportion estate taxes to the elective share because it eliminated the following language from former section 15-11-207(3)(b), entitled "Determination of elective share-liability for contribution":
For the purposes of this computation, no federal estate or state tax shall be subtracted from the value of the augmented estate. All such taxes shall be apportioned as provided in section 15-12-916(2).
This section set forth the computations for determining a surviving spouse's fractional interest in the augmented estate. However, the entire section was repealed in 1994-not just the language quoted above-when the General Assembly changed the elective share from a fractional interest to a pecuniary amount, as more fully discussed in Part III above. See generally Highlights of the Uniform Probate Code, Article II, 23 Colo. Law. 2279 (Oct. 1994). Thus, the repeal of this section does not allow personal representatives to deduct estate taxes from the value of the augmented estate before calculating the elective share, which would be contrary to section 15-12-916(2).
¶ 86 Further, when former section 15-11-207 was repealed, section 15-12-916(2) was in *504 effect, but it was not revised. Therefore, it continued to control the apportionment of estate taxes under the Code. See Lamm v. Barber, 192 Colo. 511, 518, 565 P.2d 538, 543 (1977) (explaining that an amendment "must be read, not in a vacuum, but in the context of the entire preexisting statutory ... scheme"), disapproved of in part by Bd. of Cnty. Comm'rs v. Fifty-First Gen. Assemb., 198 Colo. 302, 307-08, 599 P.2d 887, 891 (1979) ; cf. People v. Trujillo, 251 P.3d 477, 481 (Colo.App.2010) ( "provisions introduced by an amendatory act should be read together with provisions of the original section that were ... left unchanged" (quoting 1A Norman J. Singer, Sutherland Statutory Construction § 22:34 (6th ed. 2000) )).
¶ 87 In addition, the structure of the Code shows that apportionment under section 15-12-916(2) is unrelated to identifying and allocating general administrative expenses for purposes of the augmented estate, which are addressed in section 15-11-202. But only section 15-12-916(2) affords specific treatment to "Apportionment of estate taxes." Therefore, section 15-12-916 negates any suggestion of treating estate taxes as a general administrative expense. See Crandall v. City & Cnty. of Denver, 238 P.3d 659, 662 n. 2 (Colo.2010) (holding a specific statutory provision takes precedence over a more general one).
¶ 88 Accordingly, the probate court properly concluded that estate taxes were not allocable, directly or indirectly, to Mrs. Beren's elective share.
B. Allocation of Goodyear's Compensation and Berenergy's Overhead Expenses to the Estate
¶ 89 The probate court ruled:
All administrative expenses that [Goodyear] determines are properly allocable to estate administration rather than to an entity owned by the estate, whether occurring outside of the control of the surviving spouse or reasonable and necessary to the administration of any estate of this size and complexity, shall be included in the computation of administrative expenses.
It directed Goodyear that "allocation of administrative costs as between the estate and entities owned by the estate should be made on a consistent and defined basis."
¶ 90 In approving Goodyear's compensation request, the probate court found:
[Goodyear's] proposed allocation of his compensation between the estate and the estate-owned entities is reasonable.... Accordingly, the Court hereby approves the ... allocation of 38 percent of the additional final compensation approved by this Order to the estate-owned entities; [and] approves allocation of the remaining 62 percent of the approved additional final compensation to the estate as a direct administrative expense....
The court also approved Goodyear's allocation of 2.3 percent of Berenergy's general overhead expenses to the estate as administrative expenses.
¶ 91 David Beren argues that all of Goodyear's compensation should have been classified as an administrative expense because his management duties for Berenergy were "inextricably intertwined" with administration of the estate. David Beren raised this argument in his objection to Goodyear's petition for additional compensation:[9]
David I. Beren further objects to the allocation that [Goodyear] has made of a significant portion of his total requested compensation to Berenergy such that Miriam Beren, improperly, would not bear her share of such portion allocated to Berenergy.
However, he presented no expert testimony or other evidence that management and estate administration were so intertwined.
¶ 92 David Beren also argues that all of Berenergy's overhead expenses should have been classified as administrative expenses because Berenergy is an estate-owned entity and such expenses benefited the estate. Again, however, he did not present evidence *505 of any specific expense allocated to Berenergy that was so closely related to estate administration it should have been allocated to the estate.
¶ 93 Reviewing a probate court's determination of administrative expenses for an abuse of discretion, see Estate of Smith, 718 P.2d at 1074, we discern no such abuse.
¶ 94 The Code does not define "administrative expenses." In general, such expenses are a necessary result of administering the estate. Compare id. at 1073 (attorney and accounting fees incurred in defending claim to an elective share were "personal costs" and not "costs of the estate administration"), with In re Estate of Painter, 671 P.2d 1331, 1334 (Colo.App.1983) (fees collectable for expenses in estate litigation must be related to services incurred in an attempt to benefit the estate); 26 C.F.R. § 20.2053-3 ("The amounts deductible from a decedent's gross estate as 'administration expenses' ... are limited to such expenses as are actually and necessarily, incurred in the administration of the decedent's estate....").
¶ 95 David Beren relies on three out-of-state cases: In re Peabody's Estate, 218 Wis. 541, 260 N.W. 444 (1935) (discussing the amount of compensation for trustee who manages estate business); Stone v. Baldwin, 348 Ill.App. 225, 109 N.E.2d 244 (1952) (trustee must account for management compensation to the trust); and In re Witkind's Estate, 167 Misc. 885, 4 N.Y.S.2d 933 (N.Y.Sur.Ct.1938) (fiduciary must account not only for estate transactions but also for the operations of corporation and related fiduciary acts).
¶ 96 These cases address compensation of a fiduciary who also manages a business owned by an estate or a trust, but none of them holds that all such expenses must be deemed administrative expenses. Nor do any of them provide criteria for differentiating between a fiduciary's actions in estate or trust administration and the fiduciary's day-to-day responsibilities managing trust or estate-owned business.
¶ 97 Such a broad holding would be difficult to reconcile with the rationales in cases such as Estate of Smith and Estate of Painter because it would not allow a probate court to exercise informed discretion in allocating administration expenses. Estate of Smith, 718 P.2d at 1074. Rather, consistent with Estate of Smith and Estate of Painter, in determining whether a management expense is administrative, a court should look to the nexus between the expense and administration of the estate on a case-by-case basis.
¶ 98 Here, this approach would avoid unfairness to Mrs. Beren. Our rejection of the equitable adjustment means that she will not benefit from Goodyear's management of Berenergy while the estate remained open. However, under David Beren's proposed one hundred percent allocation, her elective share would be reduced by management expenses that resulted in a greater value for distribution to the residuary beneficiaries. Further, David Beren has not shown how all such expenses were related to "the collection of assets, payment of debts, and distribution of property." Lindberg v. United States, 164 F.3d 1312, 1321 (10th Cir.1999) (payment made to descendants to settle tort claims was not an administrative expense because it was not "incurred in administering the estate").
¶ 99 Therefore, the probate court did not abuse its discretion in holding that some but not all of Goodyear's management expenses involved "a direct administrative expense" of the estate, but most overhead expenses were not incurred in the estate's administration.
¶ 100 Nor are we persuaded otherwise by David Beren's argument that allocation of 2.3 percent of Berenergy's overhead expenses to estate administration was unreasonable given the 62 percent allocation of Goodyear's compensation to the estate. As shown in Goodyear's exhibit setting forth the allocation, few of the general overhead expenses of Berenergy were incurred for estate administration. And David Beren offered no specific contrary evidence.
¶ 101 Accordingly, the probate court did not err in approving Goodyear's allocation of overhead expenses and his compensation between the estate and Berenergy.
C. Berenergy Litigation Expenses
¶ 102 The probate court declined to treat expenses in connection with separate *506 litigation between Berenergy and the four brothers' corporations as an administrative expense of the estate. It found:
[T]he estate was not a party to the litigation, Berenergy was the proper plaintiff, and accordingly, the expenses were properly borne by Berenergy, rather than by the estate.
¶ 103 David Beren argues that the probate court's ruling was an abuse of discretion because the litigation benefited the estate and assisted in administration. Again, we discern no abuse of discretion.
¶ 104 The probate court found that Goodyear had initiated the litigation to clarify issues regarding Berenergy's "ownership, value, debt and management." As summarized in Zab, Inc. v. Berenergy Corp., 136 P.3d 252, 254 (Colo.2006) :
Sheldon Beren died in 1996. At that time, his estate obtained his stock in Berenergy and operational control over the corporation. A dispute arose between Berenergy and the Beren Sons' Corporations as to whether Berenergy had a contractual obligation to continue charging the [reduced] $150.00 per well per month overhead rate....
To clarify its obligations, Berenergy sought a court declaration of (1) the legal relationship between Berenergy and the Beren Sons' Corporations and (2) whether Berenergy had a contractual obligation to continue charging Petitioners the $150.00 fixed rate. Berenergy also sought to recover the amount undercharged since Sheldon Beren's death.
Thus, although the litigation was connected to the estate because the estate obtained decedent's stock in and had operational control of Berenergy, the litigation concerned the contractual obligations of Berenergy, not the administration of the estate.
¶ 105 Accordingly, the probate court did not abuse its discretion in declining to treat the litigation expenses as administrative.
VIII. Partnership Debts
¶ 106 David Beren next contends the probate court erred in denying the Petition for Order Compelling Personal Representative to Collect Debts that CJD Investors Ltd. Partnership (CJD) allegedly owed to the estate for advances made by decedent to CJD, some of which had been distributed to Miriam's children, who were its limited partners. We discern no error.
¶ 107 The probate court's factual determinations are reviewed for clear error, meaning a complete lack of support in the record. Levine v. Katz, 192 P.3d 1008, 1012 (Colo.App.2006). Its legal determinations are reviewed de novo. Id.
¶ 108 In 1991, decedent, through Berenergy, as general partner, along with Miriam's children, formed CJD. Berenergy held a 1 percent interest and each of Miriam's children held a 33 percent interest. Immediately after the certificate of limited partnership had been filed, decedent caused a royalty interest to be assigned to CJD. Between mid-1992 and early 1993, decedent contributed a total of $3 million to CJD. The limited partners received significant cash distributions from CJD. With record support, the probate court found that these transfers were "gifts from a generous father to his children," and concluded that the transfers could not "comprise part of Berenergy or the estate on the date of Sheldon Beren's death." David Beren does not dispute this finding.
¶ 109 In mid-1993, the attorney who had drafted the initial CJD limited partnership agreement, Doug Pluss, prepared an amended agreement. The amended agreement, which bore an "effective date" of July 1, 1992-before decedent's contributions-provided that all of the distributions would be repaid and decedent would receive an aggregate seven percent rate of return. Decedent signed his own name and the names of the limited partners to the amended agreement. With record support, the probate court found that the repayment obligation with a guaranteed rate of return in the amended agreement had been created to avoid a contemplated gift tax problem, and in any event, "had no economic substance but was intended merely to attract favorable tax treatment." David Beren does not challenge this finding either.
*507 ¶ 110 Instead, David Beren argues that CJD is liable to repay the contributions plus the guaranteed rate of return because the limited partners ratified the amended agreement, which they had not signed, primarily through receiving distributions. We reject this argument, for two reasons.
¶ 111 First, once a donor has completed a gift by relinquishing possession and control, the gift "is beyond the power of the donor to recall it." Johnson v. Hilliard, 113 Colo. 548, 554, 160 P.2d 386, 389 (1945) ; see also In re Estate of Heyn, 47 P.3d 724, 727 (Colo.App.2002) (citing Johnson ). Thus, because decedent's actions concerning the amended agreement were unilateral, those actions could not create an obligation on CJD or the limited partners to return the gifted property to decedent.
¶ 112 Second, assuming, without deciding, that the limited partners' alleged ratification of the amended agreement could constitute their consent to decedent resuming control over the gifted property, the court found that the limited partners "did not have full knowledge of all the material facts until pre-trial in this matter and when the facts were known to them, they promptly repudiated this amendment." Because David Beren recognizes this standard as controlling, we, like the probate court, decline to address sufficiency of the evidence of ratification. See, e.g., Hauser v. Rose Health Care Sys., 857 P.2d 524, 529 (Colo.App.1993) ; Adams v. Paine, Webber, Jackson & Curtis, Inc., 686 P.2d 797, 801 (Colo.App.1983) ("Implied ratification may take place only when the principal has full knowledge of all circumstances surrounding the transaction."), aff'd, 718 P.2d 508 (Colo.1986).
¶ 113 In finding lack of full knowledge, the court credited the testimony of Morris Werner, Mrs. Beren's brother and her counsel during a portion of the proceedings, that he was "ignorant" of the facts surrounding the amended agreement. This finding defeats David Beren's reliance on correspondence from Werner, copied to the limited partners, which David Beren asserts should have put them on at least inquiry notice of the amended agreement and its repayment provisions, before their alleged acts of ratification. The court also credited testimony that CJD tax returns, on which David Beren similarly relies for notice to the limited partners, were prepared by Berenergy, at Goodyear's direction, and overnighted to the limited partners, in a package including several other tax returns, "with 'sign here' stickers placed on the documents." These findings are sufficient to support the conclusion that the limited partners lacked full knowledge of the amended agreement when they received the distributions that supposedly evinced ratification.
¶ 114 "Evaluation of the credibility of witnesses, including expert witnesses, is a matter solely within the fact finding province of the trial court, and we will not reweigh testimony or reevaluate evidence on appeal." Estate of Romero, 126 P.3d at 231 ; see also In re Estate of Schumacher, 253 P.3d 1280, 1287 (Colo.App.2011). And while here the evidence of knowledge, actual or constructive based on inquiry notice, was disputed, an appellate court may not disturb a trial court's factual findings based on such evidence. See, e.g., Public Serv. Co. v. Blue River Irrigation Co., 829 P.2d 1276, 1280 (Colo.1992).
¶ 115 Accordingly, the probate court did not err in denying the Petition for Order Compelling Personal Representative to Collect Debts.
IX. Cross-Appeal
A. Four Brothers' Distributions
¶ 116 On cross-appeal, Miriam's children first contend the probate court erred by failing to offset against the four brothers' distributions the value of (1) transfers made by Berenergy to corporations owned by the brothers that were booked by Berenergy as loans, but which the probate court determined were gifts; and (2) oil and gas interests (Pleasant Bluell leases) that were transferred to or for the benefit of the brothers, which the probate court found to have been a proper compromise by the estate. We discern no error.
1. Loans to the Four Brothers
¶ 117 Transfers of property between parents and children are presumed to *508 be gifts until the presumption is clearly and unequivocally rebutted. Mancuso v. United Bank, 818 P.2d 732, 739 (Colo.1991).
¶ 118 Whether a rebuttable presumption has been overcome, and whether the requirements of a gift have been met, are questions of fact, and the trial court's determinations, if supported by evidence in the record, are binding on review. See Love v. Olson, 645 P.2d 861, 862-63 (Colo.App.1982) (gift); Duston v. Duston, 31 Colo.App. 147, 149-50, 498 P.2d 1174, 1175 (1972) (presumptions).
¶ 119 Here, the probate court explained:
[B]eginning in 1985, the decedent gave ... each of the four [brothers] a ten percent working interest (or the money to purchase the working interest) in certain oil and gas properties owned or acquired by Berenergy. The decedent advanced the four [brothers] or their respective corporations at least $10 million during this period.
The court found that these transfers had been made by decedent and "Berenergy was a mere instrumentality of the decedent for the accomplishment of his transfers...." It concluded that the transfers:
[L]acked the requisite "promise to repay" ... necessary to characterize them as enforceable contracts, and overall the transactions lacked sufficient substance to overcome the presumption that they were gratuitous transfers from a generous father to his children.
¶ 120 The record supports the probate court's findings that "[e]xcept for the accounting entries on the Berenergy books, there was no documentation of the decedent's transfer ... as 'loans.' " The record also supports the finding that "[t]here were no promissory notes or other evidence of the indebtedness," such as "appraisals made of any of the properties that could have secured the loans."
¶ 121 This evidence supports the probate court's conclusion that decedent intended the loans as gifts. Because the sufficiency, probative effect, and weight of the evidence, and the inferences and conclusions drawn from it, were the province of the probate court, we cannot disturb its determination here. See Estate of Romero, 126 P.3d at 231.
¶ 122 The four brothers' later acknowledgment of a limited obligation to repay based on production revenues to be derived from certain specified properties-which Miriam's children assert shows a nonrecourse loan-does not require a different result. Some evidence described decedent's evolving concern that income derived from the four brothers' producing properties, apparently acquired or developed with the funds decedent had transferred, should have motivated them to reimburse him. Initially, they disagreed, but eventually they accepted this limited reimbursement obligation.
¶ 123 If this obligation had been documented contemporaneously with the advances, it would have suggested nonrecourse loans rather than gifts. However, done retrospectively, the obligation only shows that the gift finding was disputable, not that the court erred in finding donative intent. See Johnson, 113 Colo. at 554, 160 P.2d at 389 (once a donor has completed a gift it cannot be recalled).[10]
2. Pleasant Bluell Leases
¶ 124 Personal representatives are vested with broad powers to carry out their duties under the Code. Fry & Co. v. Dist. Court, 653 P.2d 1135, 1137 (Colo.1982). Those powers include the duty "to settle and distribute the estate of the decedent in accordance with the terms of any probated and effective will and [the Code], and as expeditiously and efficiently as is consistent with the best interests of the estate." § 15-12-703(1), C.R.S.2012.
¶ 125 To carry out such a duty, the personal representative "has the power to perform, without court authorization, every act reasonably necessary to administer the estate or trust, including ... [t]o pay, contest, or otherwise settle claims by or against the estate *509 ... by compromise ...." § 15-1-804(2)(r), C.R.S.2012.
¶ 126 Here, during estate administration, Goodyear caused Berenergy to transfer its interests in the Pleasant Bluell leases to the four brothers or their companies. The probate court found that the interests "were transferred in the nature of a compromise." It explained that Goodyear's decision "was not tainted with favoritism towards the four [brothers]." Rather, he made the transfer because:
the lack of cooperation of the four [brothers] was an impediment to the administration of the estate's assets and considering the cost in time and money of other avenues of resolution....
¶ 127 The court found credible Goodyear's testimony "that this was an expedient and fair resolution of a complex situation." Based on these findings and record support for them, we cannot say that this compromise exceeded Goodyear's discretion as personal representative.
¶ 128 While Miriam's children acknowledge his discretion, they argue that the Pleasant Bluell transfer was improper because (1) Goodyear's dual roles as president of Berenergy and personal representative of the estate created a conflict of interest; and (2) Goodyear made the transfer under duress from the four brothers. However, before the probate court, Miriam's children argued only that testimony regarding the compromise was not credible and the transfer was made without any consideration or compromise by the four brothers. Because they did not argue either duress or conflict of interest below, we will not consider those arguments. See Estate of Stevenson v. Hollywood Bar & Cafe, 832 P.2d 718, 721 n. 5 (Colo.1992) (declining to address argument not made before probate court). And because the record supports the finding that the compromise was fair and not tainted with favoritism, it shows that Goodyear acted consistent with his fiduciary duties to both the estate and Berenergy.
¶ 129 Accordingly, the probate court did not err by failing to offset the four brothers' distributions.
B. Disputed Leases
¶ 130 Finally, Miriam's children contend that because a "Conveyance and Assignment" recorded in 1991 unambiguously shows decedent conveyed all of Berenergy's interest in the Moyer A and B leases (disputed leases) to CJD, the probate court erred by allowing Goodyear to determine whether decedent had intended to convey CJD only a royalty interest, and if so, to reduce their distribution by the difference in value between the interest that was conveyed and a royalty interest. We conclude that because the court did not find ambiguity in the conveyance, this ruling improperly delegated the court's judicial power to Goodyear.
¶ 131 Section 15-12-703(1) provides that a personal representative's power is conferred "by this code, the terms of the will, if any, and any order in proceedings to which he is a party ...." (Emphasis added.) Under section 15-1-805, C.R.S.2012,
The court having jurisdiction of the estate or trust may authorize the fiduciary to exercise any power not otherwise held by the fiduciary which, in the judgment of the court, is necessary for the proper collection, care, administration, and protection of the estate or the trust.
¶ 132 Here, a dispute arose during administration as to whether decedent had transferred to CJD only a royalty interest in production from the disputed leases. Miriam's children argued that decedent had transferred a working interest and moved for an order "that any and all property and sums attributable to those interests be transferred to them." They relied on the conveyance, which unambiguously transferred to CJD "[w]ithout limitation ... all other rights, titles and interests of whatever kind or character, of [decedent] in and to the oil, gas and other minerals in and under that may be produced from lands."
¶ 133 The probate court did not find the conveyance ambiguous. Nevertheless, it ordered that:
[Goodyear] has discretion to both determine whether the decedent intended to convey to [CJD] only the mineral interest owned in the lands encompassed by the *510 Moyer A and B leases or whether he intended to convey the working interest in the property, if such a determination can be made based on the information available to [Goodyear].
The court explained that Goodyear was "in the best position to make this factual determination."
¶ 134 Following the court's order, Goodyear concluded that decedent had "only intended to transfer ... the royalty interest held on these leases," and that "[t]he transfer of the working interests was made in error and should be reassigned...." Ultimately, Goodyear determined that CJD should retain the disputed leases, but the distributions to Miriam's children, as 99 percent owners of CJD, would be set off for the difference between the value of the working interest conveyed and that of the royalty interest, which he concluded decedent had intended to convey.
¶ 135 We reject the argument of David Beren and Goodyear that Goodyear's decision was within his broad discretion to effectuate a compromise. Unlike the compromise concerning the Pleasant Bluell leases-from which both the four brothers and Berenergy received a benefit-Goodyear's resolution of the disputed leases only benefitted Berenergy. CJD received nothing.
¶ 136 Further, neither section 15-1-804 nor 15-12-703 empowers a personal representative to resolve such disputes after they have been raised in the probate court. Nor has any case cited section 15-1-805 as authorizing such a delegation of judicial powers.
¶ 137 Where, as here, a recorded conveyance is unambiguous, the court must enforce its terms unless the instrument is voidable or subject to reformation on grounds such as mistake. See O'Brien v. Village Land Co., 794 P.2d 246, 249 (Colo.1990) ; see also Boyer v. Karakehian, 915 P.2d 1295, 1300 (Colo.1996). Thus, when Miriam's children asked the probate court to resolve this dispute, Goodyear's discretion was limited to deciding whether the estate would accede or seek reformation of the conveyance for mistake. If he chose the latter, the court was obligated to take evidence and either enforce the conveyance as written or decide that it should be reformed.
¶ 138 Instead, the court empowered Goodyear to decide the mistake issue and then to implement that decision by offsetting the distribution to Miriam's children. By treating his action as an exercise of discretion rather than itself deciding the mistake issue, the court effectively deprived Miriam's children of the interest in the disputed leases that had been conveyed to CJD without judicial process. See generally Sapero v. State Bd. of Med. Exam'rs, 90 Colo. 568, 577, 11 P.2d 555, 558 (1932) ("[C]ourts cannot delegate their judicial duties.").
¶ 139 Accordingly, this portion of the order approving the plan of distribution must be set aside. On remand, Goodyear (or his successor) may exercise discretion under section 15-1-805 to seek reformation of the conveyance for mistake. In that event, the probate court shall allow Miriam's children, Goodyear (or his successor), and David Beren to present evidence on the conveyance.[11] Then the court shall decide whether the conveyance is subject to reformation because decedent mistakenly transferred a working interest to CJD. If the court so concludes, it shall again approve that portion of the plan. If it does not, then the plan must be revised to restore the offset to Miriam's children.
X. Conclusion
¶ 140 The probate court's order augmenting the elective share in the amount of $24,501,457 is reversed. This sum, plus interest at the statutory rate from the date of distribution to Mrs. Beren, shall be returned to the estate and distributed to the residuary beneficiaries according to the will.
¶ 141 The probate court's order approving the final plan of distribution is vacated in part, as to the issuance of Class A and Class B shares in Berenergy, and as to the reduction of the distribution to Miriam's children based on the value of the working interest in *511 the Moyer A and B leases. The probate court shall conduct further proceedings on these two aspects of the plan in accordance with this opinion. In all other respects, all of the probate court's orders are affirmed.
XI. Petitions for Rehearing
¶ 142 All petitions for rehearing are denied. In response to the petitions, ¶ 61 above has been modified, and the opinion is further modified as follows.
¶ 143 In reversing the probate court's order augmenting the elective share in the amount of $24,501,457, we ordered Mrs. Beren to repay this sum "plus interest at the statutory rate from the date of distribution." In her petition for rehearing, Mrs. Beren contends that her obligation to repay should be reduced by the taxes that she had paid on this amount, should not be subject to interest, and remains subject to the same equitable considerations that she argued support the probate court's equitable adjustment.
A. Taxes
¶ 144 Mrs. Beren cites no authority, nor have we found any in Colorado, holding that a party ordered to repay a judgment is entitled to a credit for taxes. We decline to adopt this broad principle, which could lead to collateral inquiries, and expert testimony, such as whether Mrs. Beren should have sought to defer payment of the tax pending final resolution of the proceeding or could have disputed some of the taxes she instead paid. Cf. Hoyal v. Pioneer Sand Co., Inc. , 188 P.3d 716, 720 (Colo. 2008) ("we decline to follow decisions that allow the consideration of potential taxes in calculating economic damages"); Rego Co. v. McKown-Katy , 801 P.2d 536, 539 (Colo. 1990) (holding improper giving an instruction on nontaxability of damages in a personal injury case).
¶ 145 Nevertheless, on remand, the probate court may, in its discretion, hear evidence concerning the amount of taxes paid by Mrs. Beren on the equitable adjustment, the steps she has taken or will take to seek a refund, and the estimated time to obtain a decision from the taxing authorities. Based on that evidence, the court may, in its discretion, stay Mrs. Beren's repayment obligation, to the extent of the taxes she has paid, for a reasonable time. However, the court may not reduce her total obligation, if she is unable to obtain a refund within a reasonable time.
B. Interest
¶ 146 The parties cite no Colorado authority, nor have we found any, directly addressing the obligation of a judgment creditor to pay interest on sums received under a judgment, where the judgment has been reversed. The responses to Mrs. Beren's petition rely on section 5-12-106(1)(b), C.R.S. 2012, C.A.R. 37, and the Restatement (First) of Restitution § 74. We conclude that Mrs. Beren's obligation to pay interest on the amount of the equitable adjustment, including the appropriate interest rate, shall be determined by the probate court on remand, based on equitable considerations.
¶ 147 Mrs. Beren first argues that no party who challenged the equitable adjustment asked that repayment include interest. She is correct. However, she cites no Colorado authority holding lack of such a request to be preclusive. To the contrary, in Town of Breckenridge v. Golforce, Inc. , 851 P.2d 214, 217 (Colo. App. 1992), the division held that "if a court finds that a claimant is entitled to statutory interest under § 5-12-102, the court should award it, even in the absence of a prayer for such relief."
¶ 148 While noting that some statutes, such as section 13-21-101, C.R.S. 2012, "mandate a request in the pleadings for interest," the division relied on the broad language in C.R.C.P. 54(c) that "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings." See Town of Breckenridge , 851 P.2d at 217. The division also cited federal authority under the comparable federal rule awarding interest.[12] Id.; see also Karg v. Mitchek , 983 P.2d 21, 27 (Colo. App. 1998).
*512 ¶ 149 The question before us is more nuanced because, unlike in Town of Breckenridge (and as explained below), here the basis for interest is restitution. Nevertheless, we find the analysis in that case equally persuasive and follow it.
¶ 150 Mrs. Beren next argues that interest in Colorado is "a creature of statute," see, e.g., Farmers Reservoir & Irrigation Co. v. City of Golden , 113 P.3d 119, 132 (Colo. 2005) ; the general interest statute, section 5-12-102 does not apply for lack of any "wrongful withholding"; and C.A.R. 37 is limited to "whatever interest is allowed by law." Because the responses rely on section 5-12-106(1)(b), not on section 5-12-102, we need not address wrongful withholding.
¶ 151 Section 5-12-106(1)(b), cited in the responses, provides:
If a judgment for money in a civil case is appealed by a judgment debtor and the judgment is modified or reversed with a direction that a judgment for money be entered in the trial court, interest, as set out in subsections (2) and (3) of this section, shall be payable from the date a judgment was first entered in the trial court until the judgment is satisfied and shall include compounding of interest annually. This interest shall be payable on the amount of the final judgment.
The terms of this section do not apply here because a judgment debtor has not appealed and we have not directed that a money judgment be entered upon remand. The latter reason also precludes reliance on C.A.R. 37 ("If a judgment is modified or reversed with a direction that a judgment for money be entered in the trial court, the mandate shall contain instructions with respect to allowance of interest.").
¶ 152 Restatement (First) of Restitution § 74 provides:
A person who has conferred a benefit upon another in compliance with a judgment, or whose property has been taken thereunder, is entitled to restitution if the judgment is reversed or set aside, unless restitution would be inequitable . . . .
According to Comment d , "upon reversal of the judgment the payor is entitled to receive from the creditor the mount thus paid with interest."
¶ 153 In Tuscany, LLC v. Western States Excavating Pipe & Boring, LLC , 128 P.3d 274, 281 (Colo. App. 2005), a judgment debtor sought to recover the fair market value of its property, sold at a sheriff's sale, from the judgment creditor upon reversal of the underlying judgment. Citing section 74, the division concluded that the debtor could recover only what "was paid as proceeds from the sheriff's sale, plus statutory interest."[13] Id. at 281 ; see also Berger v. Dixon & Snow, P.C., 868 P.2d 1149, 1153 (Colo. App. 1993) ("a person who has paid money to another in compliance with a judgment which is reversed or set aside is entitled to restitution"); see generally Arkadelphia Milling Co. v. St. Louis Southwestern Ry. Co., 249 U.S. 134, 145-46, 39 S.Ct. 237, 63 L.Ed. 517 (1919) ("a party against whom an erroneous judgment or decree has been carried into effect is entitled, in the event of a reversal, to be restored by his adversary to that which he has lost thereby").
¶ 154 Notwithstanding that interest is a "creature of statute" language in several Colorado cases, we find the division's application of section 74 in Tuscany LLC persuasive and apply it here. Awarding interest under restitution principles would restore the estate to the position it would have been absent the erroneous equitable adjustment. See Arkadelphia Milling Co ., 249 U.S. at 145-46, 39 S.Ct. 237 (restitution is based on the principle "that a party against whom an erroneous judgment or decree has been carried into effect is entitled, in the event of a reversal, to be restored by his adversary to that which he has lost thereby"); see generally Berger , 868 P.2d at 1153 ("a person who has paid money to another in compliance with a judgment which is reversed or set aside is entitled to restitution"). Nevertheless, we must address Mrs. Beren's alternative argument that any interest obligation is subject to equitable considerations, which should be considered on remand.
*513 ¶ 155 Section 74 provides for restitution "unless restitution would be inequitable." Although the opinion in Tuscany, LLC does not mention equity, the division's explanation that judgment creditors should not "risk [] liability for damages exceeding return of the execution sale proceeds, which rarely constitute fair market value," reflects the equities. 128 P.3d at 281. Other courts have emphasized the equitable nature of restitution. See, e.g., Munoz v. MacMillan , 195 Cal. App. 4th 648, 657-58, 124 Cal. Rptr. 3d 664, 672 (2011) ; Hitchcock v. Delaney , 86 P.3d 73, 75 (Or. Ct. App.2004) ; Ehsani v. McCullough Family Partnership , 159 P.3d 407, 409-10 (Wash. 2007).
¶ 156 Therefore, on remand, the probate court shall consider, and may, in its discretion, take additional evidence on, whether equitable considerations reduce or eliminate Mrs. Beren's obligation to repay interest on the equitable adjustment.
C. Other Equitable Considerations
¶ 157 Mrs. Beren also raises several other equitable arguments, including whether she bore any fault for the protracted probate proceedings and attendant increase in administrative expenses; whether payment of her elective share would have included in-kind assets, subject to substantial appreciation; and whether the net effect of the remand order will leave her with considerably less than what she would have received as her elective share, had it been paid in 2000. The responses dispute these assertions.
¶ 158 These arguments are inextricably intertwined with the probate court's rationale for the equitable adjustment, which we have set aside. To consider them on remand, as Mrs. Beren urges, would allow her to accomplish indirectly that which we have held she should not have been allowed to accomplish directly. Therefore, we decline to revisit them, nor shall the probate court do so on remand, except concerning interest as set forth in the preceding subsection.
Judge LOEB concurs.
Judge TAUBMAN concurs in part and dissents in part.

A guardian ad litem was appointed to represent the minor and unborn issue of decedent because the will established a generation skipping trust.

In contrast, the prior version of section 15-11-201 provided "the surviving spouse has a right of election to take a fraction of the augmented estate designated by the surviving spouse...." Ch. 186, sec. 1, § 15-11-201(1), 1981 Colo. Sess. Laws 911. Such a share was "valued on the date or dates of distribution," Ch. 186, sec. 1, § 15-11-207(3)(b), 1981 Colo. Sess. Laws 913, and not as of the decedent's death. See In re Estate of Cole, 200 N.J.Super. 396, 491 A.2d 770, 775 (1984) (explaining that a "date-of-death valuation" converts a fractional elective share into a pecuniary share).

In re Estate of Perry, 33 P.3d 1235 (Colo.App.2001), also cited by Mrs. Beren, is similarly distinguishable. There, the division held that the probate court must determine whether the decedent's missing will was lost or had been knowingly destroyed, and therefore revoked, by the decedent. It recognized the common law presumption of destruction where a will last seen in the possession of the decedent cannot be found, explaining, "because neither [section] 15-12-407 nor [section] 15-12-402 addresses the burden of proof when a will is lost or destroyed, this presumption continues to apply." 33 P.3d at 1236. But here, valuation of an elective share has been addressed, and in detail.

The 2008 amendments to the Uniform Probate Code included section 2-209(e), which treats the "unsatisfied balance of the elective share" as a "general pecuniary devise" entitled to interest. Colorado has not adopted this amendment, although the legislature has adopted other provisions of the 2008 amendments. See, e.g., § 15-11-201(2), C.R.S.2012.

Other states are divided on whether a spouse is entitled to interest on the elective share. Compare Price v. Florida Nat'l Bank, 419 So.2d 389 (Fla.Dist.Ct.App.1982) (spouse not entitled to interest accruing to his elective share notwithstanding a substantial lapse of time between the date of decedent's death and the date of distribution), with In re Kasenetz, 196 Misc.2d at 321, 765 N.Y.S.2d at 218 (elective share is entitled to interest under a New York statute).

Given this conclusion, we need not address the parties' additional arguments on the equitable adjustment, including the rate of interest; whether it was an administrative expense; and whether it should have been apportioned on a pro rata basis.

We reject Goodyear's argument that David Beren invited this error because we conclude that the trial brief on which Goodyear relies is ambiguous. On the one hand, David Beren's exhibit shows contribution liability for the bequests. On the other hand, the brief also argues that Mrs. Beren waived her right to contribution in the settlement.

See also SmithKline Beecham Corp. v. Apotex Corp., 439 F.3d 1312, 1320 (Fed.Cir.2006) ("arguments raised in footnotes are not preserved"); Wagner v. Georgetown Univ. Med. Ctr., 768 A.2d 546, 554 n. 9 (D.C.2001) ("The bare mention of [a] claim in a footnote ... does not suffice to preserve the argument for our consideration.").

To the extent David Beren also argues "it was improper for the court to make this allocation" because the petition only concerned Goodyear's compensation as a personal representative and not as a manager of Berenergy, we decline to address arguments raised for the first time in this court. See Estate of Stevenson v. Hollywood Bar & Cafe, Inc., 832 P.2d 718, 721 n. 5 (Colo.1992).

Eventually, Berenergy wrote off of the loans, for reasons that were not developed below. Regardless, Miriam's children do not challenge this action, which would be a matter of business judgment.

Zev Beren, Jonathan Beren, and Daniel Beren do not dispute this issue in their Answer/Reply brief.

Newburger, Loeb & Co. v. Gross, 611 F.2d 423 (2d Cir. 1979) (award of prejudgment interest proper even if party had not asked for such relief at any time in trial or appellate court); Roth v. Fabrikant Bros. , 175 F.2d 665 (2d Cir. 1949) ; see generally Annot., 16 A.L.R. Fed. 748 (1973).

The opinion does not identify the interest statute.